L.R.A. 755

## John McNulta

### v.

## The Corn Belt Bank.

*Filed at Springfield November 10, 1896—Rehearing denied January 15, 1897.*

1. BANKS—*bank president's "salary" is a reward for services performed.* The power given to bank directors by section 4 of the Banking act (Laws of 1887, p. 90,) to fix the salary of their president, if it exists at all, is confined to the fixing of a reward for his performance of such duties as are appropriate to his office as president.

2. SAME—*when amount agreed to be paid to bank president is not salary.* An amount fixed by bank directors, upon organization, to be paid to their president, in addition to a salary named, for his "acceptance" of the presidency and the performance by him of acts not embraced among his duties as president, is a bonus, and not a salary.

3. SAME—*when vote of directors fixing president's salary is illegal.* A resolution adopted by directors about to organize a bank, fixing the salary of their president, and voting him, in addition, a bonus, is illegal, when the president himself, as chief stockholder, votes for the resolution and his vote is essential to its adoption.

4. SAME—*capital stock of bank can be increased only as provided by statute.* An increase of the capital stock of a bank organized under the general Banking act (Laws of 1887, p. 89,) is a fundamental change in its organization, and can only be accomplished on the authority of the shareholders, in the manner provided by law.

5. SAME—*effect of statement in an application to Auditor of intention to increase capital stock.* The statement in the application to the Auditor for permission to organize a bank, that it is the purpose to increase the capital stock, actually fixed therein at $100,000, to $300,000, has no effect in the matter of a subsequent increase of such capital stock.

6. SAME—*when directors' resolution concerning increase of capital stock is invalid.* A resolution adopted by the directors of a bank about to be organized under the general law, which assumes to fix in advance increases of the bank's capital stock and when they shall be made, is invalid.

7. SAME—*who may ratify unauthorized act of bank directors.* The unauthorized action of a board of bank directors, taken before complete organization, can only be ratified by *bona fide* stockholders.

8. SAME—*bona fide stockholders of a bank are such as have paid.* Persons assuming to be stockholders of a bank, who have not paid for their stock and "dedicated" the sum paid to the business, as required by statute, (Laws of 1887, sec. 5, p. 90,) but have instead produced a sum temporarily to be counted by the Auditor in order

to procure a certificate of complete organization, which sum is immediately withdrawn, are .not *bona fide* stockholders, and cannot ratify previous acts of the directors.

9. SAME—*directors cannot release subscriber to stock.*   Directors of a banking corporation have no power to release an original subscriber to its capital stock, or to make any arrangement with him by which the corporation, its creditors or the State shall lose any of the benefit of his subscription.

10. SAME—*by-law dictating how stockholders must vote is illegal.*   A by-law passed by directors providing that "all stock in this bank shall be sold or transferred only upon the express condition that it will be voted in favor of all propositions submitted by the directors to increase the capital stock from time to time," is illegal and void.

11. SAME—*by-law restricting transfer of stock is invalid.*   A by-law passed by bank directors which makes the sale and transfer of stock in effect subject to the consent and approval of the directors, is illegal and void.

12. CONTRACTS—*illegal agreement will not be enforced.*   An agreement by bank directors to pay a bonus to their president in consideration of his carrying out unlawful provisions of the by-laws, and for bringing about an illegal organization of the bank by furnishing a temporary fund to be counted by the Auditor so the latter will issue the bank a certificate of organization, is void.

13. SAME—*ultra vires is an available defense to executory contract of corporation.*   A corporation can avail itself of the defense of *ultra vires* where the contract still remains executory.

14. SAME—*no rights grow out of an illegal contract.*   Where parties to an illegal contract are *in pari delicto* the law will not aid either, but will leave them without remedy against each other.

*McNulta v. Corn Belt Bank,* 63 Ill. App. 593, affirmed.

APPEAL from the Appellate Court for the Third District;—heard in that court on appeal from the Circuit Court of McLean county; the Hon. ALFRED SAMPLE, Judge, presiding.

This is an action of assumpsit, brought on January 25, 1894, by appellant against appellee to recover $3750.00, or two and one-half per cent on $150,000.00 of unissued stock, claimed to be due to appellant for accepting the office of president of the appellee bank, and for certain services alleged to have been performed.   The declaration, which contains the common counts and two addi-

tional counts, declares upon the resolution hereinafter set forth, which was adopted by the directors of said bank on November 21, 1891. The pleas are the general issue, *non est factum* and set-off. Under the latter plea it is sought to recover back from appellant $3750.00, alleged to have been wrongfully paid to him. Jury was waived by agreement, and the cause was tried before the circuit judge without a jury. The trial court found the issues for appellee upon the first and second pleas, and against it on the third plea, being the plea of set-off. A motion for new trial was overruled, and judgment rendered in favor of appellee for costs. From the judgment so rendered, an appeal was taken to the Appellate Court. The latter court affirmed the judgment of the circuit court, and the present appeal is prosecuted from such judgment of affirmance. The appellee assigns a cross-error upon the finding against the allowance of the amount claimed in the plea of set-off.

The material facts in the case are as follows: On October 5, 1891, the Auditor of the State issued to appellant and other persons a permit to organize a banking association under the Banking act of Illinois of June 16, 1887, amended June 3, 1889. (3 Starr & Cur. Stat. p. 105; Rev. Stat. chap. 16*a*.) The application to the Auditor for permission to organize stated the name to be Corn Belt Bank; business to be carried on in Bloomington, Ill.; capital stock, $100,000.00, with purpose to hereafter increase to $300,000.00; amount of each share, $100.00; number of shares, 1000, to be increased to 3000; duration of association, ninety-nine years. Appellant subscribed for nine hundred shares of stock, and ten others for ten shares each. At a meeting of the subscribers, held, pursuant to notice, on October 27, 1891, at which all the shares of stock were represented, and at which appellant was elected temporary chairman, the number of directors was fixed at eleven, and all of the eleven subscribers to the stock were elected directors. On the same

day and immediately following the meeting of the stock-holders, a meeting of the directors was held at which appellant was elected president of the board of directors, J. T. Snell was elected vice-president, the salaries of the teller and book-keeper were fixed, and committees were appointed. At a subsequent meeting of the directors held on November 21, 1891, the resolution, set out in the declaration and heretofore mentioned, was adopted, the full board being present. That resolution is as follows:

"Whereas, John McNulta has been elected president of the Corn Belt Bank, and preliminary to his acceptance of said office and entering upon the duties of the same it is necessary to fix and agree upon compensation for his services as such president; therefore, be it

"*Resolved*, That it is understood and agreed that the compensation of John McNulta, as such president, shall be $100.00 per year, payable in semi-annual installments, and as a further consideration for his acceptance thereof, an additional sum equal to two and one-half (2½) per cent on all stock to be issued, payable at the time fixed for such issues, that is to say, at least $100,000.00 par value of the said stock is to be issued within one year after the opening of the said bank for business, and another additional $100,000.00, making $300,000 in all that is to be issued, including the first issue of $100,000.00, within two years from that date. The said John McNulta, by his acceptance hereof, agrees to subscribe for and take at par value all of such stock, in lots of not more than $50,000.00 each, within any one period of thirty days after the preceding lot has been fully disposed of, paying therefor in cash, par value, with his own funds, whenever the board of directors shall find responsible persons agreeing to purchase the same from him at such a price as may be fixed by the board, not less than 105, and interest at seven per cent from the date of the issue of such stock, and to sell the same to the persons and in the amounts designated by the board, with only the restrictions in transfer in use at the time of the commencement of business, for the purchase and sale of which stock said John McNulta is also to have interest at the rate of seven (7) per cent per annum, and exchange on New York, on all sums so invested by him, the overplus arising from the sale of said stock by him to inure to the benefit of the bank, and be disposed of as the board of directors may see fit."

Subsequently on December 2, 1891, a meeting of the directors was held, and the minutes of that meeting, before proceeding to state the other business that was transacted, recite that the full board was present, and that the bank was "formally opened at 10:30 A. M. after inspection by Auditor's deputy." What action was taken at the meeting of December 2, 1891, is hereafter referred to; and, before further alluding to such action, the facts in regard to the "inspection by the Auditor's deputy" may be here stated.

Appellant and the ten other original subscribers to the capital stock paid nothing upon their subscriptions. The ten, who subscribed for ten shares each, gave their notes for $1000.00 each, and one of the witnesses says: "McNulta owned the other $90,000.00; to my knowledge he did not pay any money into the bank for that $90,000.00." Arrangements were made with the First National Bank of Bloomington to furnish $100,000.00 in currency, which was so furnished. This amount of currency, $100,000.00, was taken over from the First National Bank to the Corn Belt Bank, and was there counted by the deputy of the Auditor as money paid in upon the subscriptions to the capital stock; but, after it was so counted and upon the same day, it was taken back to the First National Bank, or, to speak more accurately, $75,000.00 of it was taken back to the First National Bank, and $25.000.00 of it was applied for the benefit of that bank upon a purchase by it of certain drafts, as hereafter stated.

Appellant obtained in Chicago certain certificates of deposit issued by a bank of that city payable to his order, and certain drafts drawn by said Chicago bank to his order upon a bank in New York, amounting altogether to $100,000.00. These certificates and drafts were brought from Chicago to Bloomington by a special messenger and were endorsed by appellant, who left them with the First National Bank of Bloomington, and thereby obtained $100,000.00 in currency to use for the

inspection of the Auditor. The president of the First National Bank says, that he concluded to purchase $25,000.00 of the drafts, so that he only received back $75,000.00 of the currency and surrendered $75,000.00 of the drafts and certificates. The $25,000.00 in currency and $75,000.00 in drafts were at once sent back to Chicago. They did not belong to the Corn Belt Bank. They were placed to the credit of the appellee at the bank in Chicago, but drafts to the amount of $101,250.00 were at once drawn, dated December 2, 1891, by the assistant cashier of appellee upon the Chicago bank payable to appellant's order. Upon the back of these drafts appear endorsements by appellant and others.

Howell, the present president of the appellee bank, and one of the original subscribers for ten shares, says: "When the matter of organization was talked up, McNulta assured us he had made arrangements with a syndicate in Chicago for the money; it could be sent down here and held while the Auditor counted it; could then be sent to Chicago, and could then sell stock to parties desiring it; my understanding is, it was so done." The appellant, after stating that he transferred the drafts and certificates to the First National Bank to get the currency, says: "I got this money to use it as long as we thought it would be required; that time was made as short as possible." Whether or not the parties, whose names were endorsed upon the drafts drawn upon the Chicago bank, belonged to the syndicate furnishing the money, does not definitely appear. But certain it is, that the money, which was used for the inspection of the Auditor on December 2, 1891, was in Chicago on December 3, 1891, in the hands of other parties than appellee.

After the inspection of the money by the Auditor and the formal opening of the appellee bank on December 2, 1891, the directors at their meeting on that day adopted by-laws, fixed the salaries of the teller and cashier at the rates previously adopted by the board, and "on mo-

tion the salary and compensation of the president was fixed as previously adopted by vote of the board. The vice-president presiding, the vote was taken by roll call, and all members voting in favor thereof. In each case of the fixing of salary and compensation the several original resolutions were re-adopted, with the understanding that the time of employment was as provided in the by-laws." At a meeting of stockholders immediately following the meeting of directors all the stock was represented, all the members and shares voted to approve the by-laws, and to "approve and confirm all the records, proceedings and transactions of the board to date."

Section 2 of article 6 of the by-laws is as follows: "The stock of this bank shall be sold only to persons who buy the same for an investment, and shall not be sold to or held by any person without the consent of the board of directors, or by any person having fifty shares or more thereof, or to any person owning any stock in any other bank in Bloomington, Illinois; that no sale or transfer of said stock shall be made to any person or firm or co-partnership the members of which, severally or collectively, hold or own fifty shares of the stock of this bank, or to any person or persons owning or holding any stock in any other bank in Bloomington, Illinois. If the stock shall be held by such prohibited persons without the consent of the board of directors of this bank, such stockholders shall not be entitled to vote any such capital stock at any election, and any dividend, earnings or profits that may accrue thereon shall inure to the benefit of this bank."

Section 4 of article 6 of the by-laws is as follows: "That all of the stock of this bank sold or transferred shall be with the express condition and understanding that it will be voted in favor of all propositions submitted by the board of directors to increase the capital stock of this bank from time to time, not exceeding $50,000.00 at any one time or within a period of sixty days, until

164—28

its capital stock reaches $300,000.00; and that the new stock be disposed of entirely to persons and in such amounts as the board of directors may direct; that the provisions of this article and the by-laws of this corporation shall become a part of every contract for the transfer of any stock of this bank, and shall operate as a reservation of a limited ownership of the stock transferred to the extent of the provisions hereof, made binding on the transferee by the acceptance thereof."

After the organization of the bank in the manner stated, the stock, issued to the original subscribers, was sold, sales being made to the original promoters at 102½ and to outsiders at 105. Four hundred and forty shares were sold at 102½, and 560 at 105, making altogether the sum of $103,900.00. Of this profit of $3900.00 the sum of $1400.00 went to appellee, and $2500.00 to the organization fund, as it was called. How much of the $2500.00 was received by appellant is not clear, as the evidence upon the subject is conflicting. It is certain, that $1250.00 of it was sent to some bank or syndicate in Chicago. One of the witnesses says, that the remaining $1250.00 went to the original promoters. Another says that the bank in Chicago received the whole of the two and a half per cent or $2500.00. The books show that appellant was credited with $102,500.00, of which $100,000,00 was for his subscription and $2500.00 for organization, but he says that this was a mistake as to the $2500.00. Howell testifies as follows: "When the matter of paying the Chicago syndicate was talked over, McNulta said, 'We will get that back to a great extent; when small banks are organized around the country, we will let them have the money for the Auditor to count, and charge them a per cent.'"

Afterwards in May, 1892, an additional amount of stock, being $50,000.00, was issued to appellant, though with much reluctance and against strong opposition. The increase of $50,000.00 had been previously author-

ized by a resolution adopted at a meeting of the stockholders. The $50,000.00 was counted by the Auditor on May 17, 1892, as being the amount paid by appellant upon his subscription for that amount of stock. He, however, as matter of fact paid no money. He obtained the $50,000.00 to be counted by the Auditor by taking $25,000.00 from the funds of the appellee bank and giving his note for that amount to the bank. The other $25,000.00 he obtained from Chicago. The books of the bank show, that $25,000.00 in currency was received from Chicago on May 17, 1892, and sent back on May 19, 1892. Of this second issue of $50,000.00 of stock, all except 116 shares, or $11,600.00 of it, was sold, but these 116 shares were not sold. Upon this transaction appellant was paid two and a half per cent or $1250.00. This $1250.00 and the $2500.00, which went to the organization fund upon the issue of the original $100,000.00 of stock, making $3750.00 in all, constitute the amount claimed by appellee under its plea of set-off.

The following is the testimony of Howell, the present president of the appellee bank, as to the withdrawal of $25,000.00 from the funds of the bank in May, 1892, to be shown to the Auditor, and as to the execution by appellant of his note to the appellee for the amount so withdrawn for such purpose: "Afterwards the question of issuing the $50,000.00 additional stock came up. McNulta insisted upon issuing it. Part of the directors thought it was not good policy. I insisted that the way we had carried the stock was under a false representation, and that it would come back on us and injure the bank, and that it would be better for the bank to pay him the two and a half per cent and quit issuing stock. He said, 'I don't want money that I have not earned; I want to carry out the original policy of the bank and get the two and a half per cent that I am entitled to.' He did not make any claim, while president, for the stock not issued. Twenty-five thousand dollars came out of the vaults of

the bank to pay for the $50,000.00 of stock that was issued. I do not know where rest came from. The whole $50,000.00 was counted in currency. A few evenings after we had counted this money the investment committee, consisting of the president, vice-president, Snell, Humphreys, Burns and self, found notes of McNulta amounting to $25,000.00. The day we counted the money Burns said, 'Is this money, or any part of it, funds of the Corn Belt Bank?' Eddy said, 'No, sir; it is Gen. McNulta's.' And he said, 'Every dollar of it is mine.' The evening we discovered these notes we sent for McNulta and asked him what he meant, without consulting with the investment committee, putting up his note when he was already close up to the limit. We understood that no one person could borrow more money than ten per cent of the capital stock, and $10,000.00 had been given the cashier as the limit of McNulta's credit. I did not know when we counted the money that McNulta had borrowed this money from the bank. We asked him what he meant by endangering the charter of the bank by such a loose way of doing business. He said his object was in saving his commissions going to the syndicate which he represented, which got one-half of the two and a half per cent he was to have. Mr. Snell said, 'If you have promised them two and a half per cent on the stock issued, how are you going to evade paying them what is due them?' He said, 'I can fix it up with them all right, and I thought I might as well save it to the bank.' The question came up if the Auditor's deputy should come and find the note for an amount greater than the law permits. He said fix it up the best way we could. Some one of the committee suggested that each of us give our notes for enough to reduce him inside the limit. I said, 'I don't owe the Corn Belt Bank $5000.00 or $6000.00, and I don't propose to give my note for that much.' McNulta suggested that each give his note for enough to bring him within the limit, and Mr. Eddy to write a contract that the note

was given without consideration to save commission to the bank. We gave our notes, stock was sold, and these notes were taken up."

Appellant continued to be president of appellee until December 2, 1892, when he retired because of the refusal of the directors and stockholders to issue any more stock. The remaining $150,000.00 of the $300,000.00 named in the resolution was never issued. The present suit is brought to recover two and one-half per cent upon the $150,000.00 which has never been issued. Appellant states, that he was released from his obligation after he left the bank. Eddy, the cashier of appellee in December, 1891, swears, that, when appellant furnished the $100,000.00 at that time in the manner already stated, "he was relieved of his obligation immediately."

Rowell, Neville & Lindley, and Welty & Sterling, for appellant:

The statute under which the defendant was incorporated gave its directors power to fix the salary of the president, and to fix it at the time the resolution involved in this suit was adopted. Banking act of 1887, secs. 1-5.

A corporation, by resolution or by-law, may authorize compensation to its president for the services and other duties required of him. *Ellis* v. *Ward*, 137 Ill. 509, and cases cited.

A stockholder, president, director or other officer may enter into contracts with his corporation. Morawetz on Corp. 527; Pierce on Railroads, sec. 31; *Heartt* v. *Brown*, 77 Ill. 226; *Beach* v. *Miller*, 130 id. 169; *Budd* v. *Walla Walla P. & Co.* 2 Wash. 347.

Acts done by promoters of a corporation subsequently approved by the corporation and the benefits thereof received are binding. Cook on Stockholders, sec. 207, and notes; *Woods* v. *Whelan*, 93 Ill. 153; *McDonough* v. *Bank*, 34 Tex. 309; *Whiting* v. *Wyman*, 101 U. S. 392; *Bonner case*, 81 N. Y. 468; *Balette case*, 37 Minn. 89.

A corporation cannot avail itself of the defense of *ultra vires* where the contract has been in good faith performed by the other party to it, and the corporation has had the benefit of the contract and of the performance. *Bradley* v. *Ballard*, 55 Ill. 413; *Darst* v. *Gale*, 83 id. 136; *Bank* v. *Brooks*, 22 Ill. App. 248; *People's Gas Light Co.* v. *Chicago Gas Light Co.* 20 id. 494; *Benefit Ass.* v. *Blue*, 120 Ill. 121.

The plea of *ultra vires* should not, as a general rule, prevail, whether interposed for or against a corporation, when it would not advance justice, but, on the contrary, would accomplish a legal wrong. *Whitney Arms Co.* v. *Barlow*, 63 N. Y. 62.

The courts will, as a general rule, presume that contracts made by a corporation which appear to be designed to promote its legitimate and profitable operation are within the limits of its powers, and if their validity be assailed the burden will be on the assailant. *Ellerman* v. *Railway Co.* 23 N. J. Ch. 287.

The fact that the president was present when the salary was voted did not affect the validity of the vote. *Hax Davis Mill Co.* 39 Mo. App. 453.

So long as honesty and good faith concur, the expediency of a contract made by the managers of a corporation in its behalf is for their determination, and their decision concludes the corporation. *Park* v. *Locomotive Works*, 40 N. J. Eq. 114.

A contract may be ratified by the stockholders of a corporation. *Kelly* v. *Newburyport, etc. Co.* 141 Mass. 496; *Railway Co.* v. *Railway and Nav. Co.* 28 Fed. Rep. 505.

For duties not strictly within the ordinary functions of the office a reasonable compensation can be recovered. *Edwards* v. *Railway Co.* 33 N. W. Rep. 100.

JOHN E. POLLOCK, and A. J. BARR, for appellee:

The board of directors had no power to contract with McNulta that $300,000 of stock should be issued. The stockholders alone had the power to say whether the

capital stock of the bank should be increased.   3 Starr & Curtis, p. 110, sec. 42.

An *ultra vires* contract cannot be ratified by the stockholders.   *Thomas* v. *Railroad Co.* 11 Otto, 83.

A director owning a majority of the stock cannot contract with himself.   *Miner* v. *Belle*, 93 Mich. 97.

The directors had no power to pay McNulta for his services as promoter, which they sought to do by allowing him the two and one-half per cent.   *Ellis* v. *Ward*, 137 Ill. 509 ; 2 Cook on Stockholders, (3d ed.) sec. 657, and cases cited.

The question of *ultra vires* is properly raised upon the plea of *non est factum* and objections to the testimony. *B. S. Green Co.* v. *Blodgett*, 49 Ill. App. 180.

The doctrine of *ultra vires* should not, as a general rule, prevail, whether interposed for or against a corporation, when it would not advance justice, but, on the contrary, would accomplish a legal wrong.   *Kadish* v. *Building Ass.* 151 Ill. 531.

*Ultra vires* is only allowed in the furtherance of justice and where it is equitable to allow it.   *Beach* v. *Miller*, 130 Ill. 169; *Ellis* v. *Ward*, 137 id. 520; 1 Morawetz on Corp. sec. 517; *Hubbard* v. *Investment Co.* 14 Fed. Rep. 676.

The contract or resolution, so-called, was not only *ultra vires*, but was absolutely void.   *Penn* v. *Bornman*, 102 Ill. 523; *Davis* v. *Railroad Co.* 131 Mass. 259; *Miner* v. *Belle*, 93 Mich. 97.

Fifer & Barry, also for appellee:

It is not within the general power of directors to release an original subscriber to capital stock, or to make any arrangement with him by which the company, its creditors or the State shall lose any of the benefits of his subscription.   Every such arrangement is regarded, in equity, not merely as *ultra vires*, but as a fraud upon other stockholders, upon the public and upon the creditors of the company.   *Burk* v. *Smith*, 16 Wall. 390; *Railroad Co.*

v. *Bowzer,* 48 Pa. St. 29; *Melvin* v. *Insurance Co.* 80 Ill. 446; *Osgood* v. *King,* 42 Iowa, 478.

A contract made with a corporation in which a director of a corporation is interested, either directly or indirectly, is voidable at the instance of the company or of the stockholders. *San Diego* v. *Railroad Co.* 44 Cal. 106; *Rice's Appeal,* 79 Pa. St. 168; *Alford* v. *Miller,* 32 Conn. 543; *Van Cott* v. *Van Brunt,* 2 Abb. N. C. 283; *Cook* v. *Woolen Mill Co.* 43 Wis. 433; *Port* v. *Russell,* 36 Ind. 60; *Rolling Stock Co.* v. *Railroad Co.* 34 Ohio, 450; *Smith* v. *Skeary,* 47 Conn. 47; *Railroad Co.* v. *Seeley,* 45 Mo. 212.

And this is so whether the director entered into the contract at its inception or subsequently acquired an interest in it. *Lyon* v. *Lawrence, etc.* 21 Kan. 365; *Railway Co.* v. *Poor,* 59 Me. 277.

The plaintiff sought this bonus as a compensation for his services as a promoter of the corporation. Such services cannot be paid for out of the funds of the bank, and if agreement has been made to pay for such services the agreement may be repudiated at any time. *Railroad Co.* v. *Ketchum,* 27 Conn. 170; *Railroad Co.* v. *Sage,* 65 Ill. 328.

Directors voting stock to themselves as compensation for selling corporate stock are liable for the value of the stock. *Assignee* v. *Stine,* 15 Phil. 37.

Salary or back pay voted to a director after the services have been rendered cannot be enforced. It is invalid and void. It is the same as giving away the assets of the corporation. 2 Cook on Stockholders, p. 923, sec. 657; *Railroad Co.* v. *Cheney,* 87 Ill. 446; *Cheney* v. *Railroad Co.* 68 id. 570; *Gridley* v. *Railroad Co.* 71 id. 200; *Holder* v. *Railroad Co.* 71 id. 106.

When a salary is fixed no compensation can be allowed for extra service. *Carr* v. *Coal Co.* 25 Pa. 337.

A resolution remunerating officers who were elected to serve without compensation is merely voluntary and revocable. *Loan Ass.* v. *Stonewetz,* 29 Pa. 534.

Mr. CHIEF JUSTICE MAGRUDER delivered the opinion of the court:

It is assigned as error, that the trial court refused to hold as law certain propositions submitted by the plaintiff below, the appellant here. By the propositions so submitted, the court was asked to hold, as matter of law, "that the resolution declared on is a resolution to pay McNulta an amount equal to two and one-half per cent on all stock to be issued in addition to the $100,000.00 past issued, and that the whole per cent was to be due upon the sum of $200,000.00 at the end of two years, whether the stock was issued or not; that it was competent for the directors of the Corn Belt Bank to pass the resolution sued on at the date of its passage, and to bind the corporation by such passage; that at the meeting of December 2, the record of which is in evidence, it was competent for the bank directors to approve and adopt the resolution declared on, and with the assent of the stockholders to bind the corporation by the terms of the resolution; that the approval of the resolution sued on by the directors at their meeting of December 2, and the approval of the same by the stockholders at the same date, was not *ultra vires*."

The subject, presented for consideration by the assignments of error, relates to the construction and validity or invalidity of the resolution referred to, which is set out in full in the statement of facts preceding this opinion.

The resolution provides for the payment of both a salary and a bonus. The salary of appellant as president of the board of directors, or his compensation for services as such president, was fixed at $100.00 per year payable in semi-annual installments. Salary is a "reward or recompense for services performed, and is usually applied to the reward paid to a public officer for the performance of his official duties." (21 Am. & Eng. Ency. of Law, p. 443, note 3, and cases cited). The Banking act of this State provides, that the directors elected by the

subscribers to the capital stock "may proceed to organize by the election of one of their number as president, and may appoint the necessary officers and employees and fix their salaries." (Rev. Stat. chap. 16a, sec. 4; 3 Starr & Cur. Stat. p. 107). If this confers upon the board of directors the authority to fix the salary of their president, their power is confined to fixing a recompense or reward to be paid to him for performing such services or duties, as are appropriate to, and required by, his office as president. But the resolution provides, that he should receive an "additional" sum, that is, a sum besides and beyond his salary, as a consideration for accepting the office of president, and that this additional sum should be equal to two and one-half per cent on all stock to be issued. To pay a man for accepting an office is not to pay him for performing the duties of an office after it has been accepted. An amount equal to two and one-half per cent upon all stock to be issued would appear to be a very large consideration to be given for the mere act of accepting the office of president of the bank, if the words, "acceptance thereof," were understood in their ordinary meaning. But the second paragraph of the resolution shows, that, by the acceptance of the office, appellant agreed to take all of the stock to be issued at a certain price, at a certain time and upon certain terms, and to sell the same in a certain way. What was to be done under the agreement involved in the acceptance of the office was not necessarily or appropriately embraced in the services or duties required of the president of a bank. Hence, the "additional sum" specified in the resolution is a bonus and not a salary.

It is very evident, that the resolution contemplated the payment of the bonus of two and one-half per cent upon the whole $300,000.00 of stock, although it is so drawn that it can be construed either as providing for two and one-half per cent upon $300,000.00, or as providing for two and one-half per cent upon the $200,000.00 to be issued

after the payment of the original capital stock. Certain it is, that the appellant and those associated with him interpreted the resolution as applying to the original $100,000.00 of capital stock, because the bonus of two and one-half per cent was paid upon the original capital stock, as appears from the statement of the facts herein. The resolution uses the words, "making *$300,000.00 in all that is to be issued*," thus treating the original $100,000.00 of stock as part of the stock to be issued, upon which the two and one-half per cent was to be calculated. The resolution was originally passed on November 21, 1891, and at that time the original $100,000.00 had only been subscribed for, and not paid in, so that the words, "paying therefor in cash par value with his own funds whenever the board of directors shall find responsible persons agreeing to purchase the same," etc., would, upon that day, apply as well to the first $100,000.00 as to the second $200,000.00. The resolution was re-adopted on December 2, 1891, after the $100,000.00 in currency had been counted by the Auditor's representative. Considered as of the latter date, the resolution would only apply to the $200,000.00 to be issued, because it does not stand to reason that there would be an agreement to subscribe for, and take at par value, and pay for in cash, stock which had already been subscribed for and taken and paid for.

Appellant contends, that he was to have the bonus of two and one-half per cent upon all the stock, whether it was actually issued or not; that he was not to have a percentage upon the stock, but a sum equal to two and one-half per cent upon the stock which it was the purpose of the bank to issue in the future, in addition to the original capital stock; and that as the designation of a percentage of two and one-half per cent was merely a mode of expressing what sum total he was to have, it was immaterial whether the stock was issued or not. Whether the resolution is capable of this construction or not, it is not such a resolution as entitles the appellant to a recov-

ery in this case under the views hereinafter expressed. It is quite clear from the terms of the resolution, that the additional sum, equal to a percentage on all stock to be issued, was only "payable at the time fixed for such issues;" and, as the times fixed for the issuance of increases in the stock could only be determined by the action of the *bona fide* stockholders when circumstances would justify such increases, that part of the resolution, which attempts to fix in advance the amount of the increase of the stock, and the time when such increase should take place, was invalid.

Section 2 of the Banking act provides, that the application to the Auditor for permission to organize shall state the amount of capital. The application here stated the capital stock to be $100,000.00, and while it also stated that there was a purpose to thereafter increase the capital stock to $300,000.00, such statement of a mere purpose or intention had no effect in the matter of increasing the capital stock.

The Banking act provides a mode in which the capital stock may be increased. By section 12 of that act, it is provided that, whenever the board of directors may desire to increase the capital stock, they may call a special meeting of the stockholders for the purpose of submitting to a vote of such stockholders the question of such increase of capital stock; that such meeting shall be called by giving to each stockholder either in person, or through the mail, a thirty days' notice, signed by a majority of the directors, stating the time, place and object of the meeting, and also by publishing a general notice of such meeting for three successive weeks in a newspaper; that, at such meeting, each stockholder shall have one vote for each share of stock held by him, and votes, representing two-thirds of all the stock, shall be necessary for the adoption of the proposed increase; that, at such special meeting, or at any regular meeting, the proposition for an increase may be submitted to a vote,

and, if it is carried by such two-thirds vote, a certificate thereof, verified by the president's affidavit and under the corporate seal, shall be filed in the Auditor's office, and in the office of the recorder of deeds of the county where the principal office of the bank is located; that, upon the filing of such certificate, the change proposed and voted for as to such increase of stock shall be declared accomplished in accordance with such vote; and that the bank shall, upon filing such certificate, cause a notice of such "change of organization" to be published for three successive weeks in a newspaper in the county where its principal office is located. (3 Starr & Curtis' Stat. pp. 110, 111).

As the appellee was organized under the statute of this State, already referred to, it could only accomplish an increase of its capital stock in the mode prescribed by that statute. It is well established, that a corporate body, having only a statutory existence, can only exercise its franchises and powers in the manner prescribed by the law under which it is organized. (*Fridley* v. *Bowen*, 87 Ill. 151). An increase or reduction of the capital stock of a corporation is a fundamental change in its affairs, and must be authorized by the shareholders at a corporate meeting. (1 Cook on Stockholders, sec. 285). It is, in the language of the statute, a "change of organization." Even where the charter of a corporation fails to state by whom the power to increase its capital stock is to be exercised, its board of directors have not, merely by virtue of their position as directors, the authority to increase the capital stock without the assent of the shareholders. (*Eidman* v. *Bowman*, 58 Ill. 444). The policy of a corporation is always under the control of a majority of its stockholders, and the lawful exercise of its franchise and business must be regulated and governed by a majority of its stockholders. (*Wheeler* v. *Pullman Iron and Steel Co.* 143 Ill. 197). By the terms of the law under which appellee was organized, an increase of its capital stock

could only be effected by a vote representing two-thirds of all the stock. The question of the increase is required to be submitted to the vote of the stockholders. The submission of the question of the increase of the stock to their votes involves and implies the exercise on their part of their own free and independent judgment as to the policy and advisability of making such increase. It involves the right to determine, in their discretion, not only whether the stock should be increased, but when such increase is to be made. In accomplishing it, the mode prescribed by the law must be followed.

It is manifest from what has been said, that a resolution passed by a board of directors, who are the mere agents and trustees of the stockholders, charged with the duty of faithfully managing their affairs, cannot fix in advance the time for increasing the capital stock of the corporation without reference to the action of the stockholders, or the methods prescribed by the statute. This is what the resolution here under consideration attempts to do by stating, that "at least $100,000.00 par value of the stock is to be issued within one year after the opening of said bank for business, and another additional $100,000.00 * * * within two years from that date." In this respect the resolution was wholly invalid. Its attempt to keep the matter of increasing the stock under the control of the original board of directors is further manifest from the provision, which it makes for the sale of the stock to the persons and in the amounts designated by the board, "with only the restrictions in transfer in use at the time of the commencement of business." The restrictions thus referred to are contained in section 4 of article 6 of the by-laws. That section provides: "That all of the stock of this bank sold or transferred shall be with the express condition and understanding that it will be voted in favor of all propositions submitted by the board of directors to increase the capital stock of this bank from time to time, not exceeding $50,000.00

at any one time or within a period of sixty days, until its capital stock reaches $300,000.00. * * * That the provisions of this article and the by-laws of this corporation shall become a part of every contract for the transfer of any stock of this bank, and shall operate as a reservation of a limited ownership of the stock transferred, to the extent of the provisions hereof, made binding on the transferee by the acceptance thereof."

This by-law is illegal and void, not only because it seeks to keep the future action of the stockholders in reference to the increase of the stock in subjection to the will of the original directors who passed the by-law, but also because it attempts to limit the right to sell or transfer stock by imposing unreasonable conditions. Shares of stock in a corporation are as transferable as any other kind of personal property; and all unreasonable attempts to restrain the right to transfer such shares are void as being against public policy. (1 Cook on Stock and Stockholders and Corp. sec. 331). The right of a stockholder to sell and transfer his stock cannot be restrained by a by-law, which makes such sale and transfer subject to the consent of the directors, or refuses to permit the same unless the directors are satisfied. (Id. sec. 332).

As the bonus to be paid to appellant was in consideration of his contemplated action in carrying out unlawful provisions for the future increase of the stock and unlawful provisions for controlling the transfer of the stock, he is not entitled to the recovery of such bonus.

This conclusion is further warranted by the fact, that the resolution, which was passed for the benefit of the appellant, was the product of his own influence. It must be remembered that appellant owned nine-tenths of the stock, he having $90,000.00 and the other stockholders only $10,000.00. When the $100,000.00 was brought over to the appellee bank from the First National Bank of Bloomington, and counted by the Auditor as paid in upon the subscriptions to the capital stock, appellant was not

only held out to the Auditor as a stockholder who had paid his subscription of $90,000.00, but the other stockholders were represented as having paid their subscriptions of $10,000.00. This sum of $10,000.00, submitted temporarily to the inspection of the Auditor, was not furnished by the stockholders, but by appellant for them. Appellant was president of the board of directors. The eleven directors were the eleven stockholders, so that whether there was a meeting of directors or a meeting of stockholders, appellant, as owner of nine-tenths of the stock, had the controlling interest and was the predominant influence. On December 2, 1891, when the board of directors met and re-adopted the resolution of November 21, 1891, fixing appellant's salary and giving him the bonus already mentioned, the minutes recite, that all the members voted in favor of the resolution; and, of course, all the members included the appellant. On the same day, when the eleven stockholders met, all the stock was represented and all the members and shares voted to confirm the previous proceedings, including the passage of the resolution; and, of course, if the minutes are correct, appellant must have voted to approve the adoption of the resolution and by-laws, which conferred upon him such large compensation. The law is, that, where a salary or compensation is voted to a director, the vote is illegal, if it is carried only by including the vote of the director who receives the pay or salary. (1 Cook on Stock, etc. sec. 657). Where the chief stockholder, who is president, induces the directors to vote a large salary to him, the corporation may defeat the officer's action at law to recover it. (Ibid; also, *Miner* v. *Ice Co.* 93 Mich. 97). Directors cannot vote a salary, much less a large bonus or compensation in addition to a salary, to one of their number, as president, when he takes part in the proceeding, or his vote is essential to the adoption of the resolution. (*Wickersham* v. *Crittenden,* 93 Cal. 17, and cases cited; *Gridley* v. *L. B. & M. Ry. Co.* 71 Ill. 200).

It is claimed, that the resolution was ratified by a meeting of the stockholders. The meeting of the stockholders held on December 2, 1891, was composed of the same men, eleven in number, who constituted the board of directors, by whom the resolution was originally passed. The same men merely sat as stockholders to approve what they had just done as directors. They were not really *bona fide* stockholders. They paid nothing for their stock, as appellant merely obtained $100,000.00 in currency, and put it in the bank for a few hours, until the Auditor counted it; and it was thus made to appear, that they were stockholders, whose stock had been fully paid for.

Section 5 of the Banking act provides that "when the directors have organized * * * and the capital stock of such association shall have been all fully paid in and record of the same laid before the Auditor, he shall * * * make a thorough examination into the affairs of such association, and if satisfied the authorized capital has been paid in, and that the association has the full amount dedicated to the business, * * * he shall give them a written or printed certificate under seal authorizing them to commence the business," etc. (3 Starr & Curtis' Stat. p. 108). The stockholders, who, under the statute, would have the power to ratify the previous acts of the directors done before the stock was paid for, were such *bona fide* stockholders as owned stock "all fully paid in" and "dedicated to the business" of the association. Here, however, there was no actual payment, as the money was withdrawn as soon as counted by the Auditor. The association did not have the full amount of its capital stock dedicated to the business. Stockholders, claiming to be such by the means thus designated, were not *bona fide* stockholders. (*Bates* v. *Great Western Tel. Co.* 134 Ill. 536; *Terwilliger* v. *Great Western Tel. Co.* 59 id. 249). Consequently, their ratification amounted to nothing.

In addition to this, the unlawful character of the contract with appellant as embodied in the resolution appears upon the face of the resolution itself. By it appellant agrees to subscribe for, and take at par value, all the stock, and pay for it in cash par value with his own funds, not absolutely and unconditionally, but only when "the board of directors shall find responsible persons agreeing to purchase the same from him," etc. His own funds are to be at once replaced by money to be furnished by purchasers of stock to be found by the directors. The resolution contemplates only the temporary use of moneys to be supplied by appellant for the purpose of taking the stock at its par value. Courts will construe a contract in the light of the circumstances surrounding the parties, and of the objects which they evidently had in view. (*Torrence* v. *Shedd*, 156 Ill. 194). So construing the present resolution, it contemplates the doing of that which was actually done, that is to say, the temporary supply of funds for the purpose of having them counted by the Auditor, and thus illegally accomplishing an organization of the bank with authority to proceed to business, and to dispose of stock *apparently* paid up in full. The bonus or compensation, which appellant was to receive, was to be paid to him for doing that which was in direct contravention of the statute, because the statute requires the capital stock to be fully paid in and dedicated to the business of the association. The agreement embodied in the resolution is an agreement to do an act forbidden by the statute, and therefore is not binding. (*Penn* v. *Bornman*, 102 Ill. 523; *Davis* v. *Old Colony Railroad Co.* 131 Mass. 258; *Miner* v. *Ice Co. supra*).

The effect of the resolution, and of what was done under it, was to release the original subscribers to the capital stock from the obligation to pay their subscriptions. When the $100,000.00 was paid in, the subscriptions appeared to be thereby discharged, but when it was taken out nothing remained in the bank to show pay-

ments of the subscriptions. Until sales were made of the stock, the bank had no funds whatever, all pretended payments upon the subscriptions being withdrawn. "It has been settled by very numerous decisions, that the directors of a company are incompetent to release an original subscriber to its capital stock, or to make any arrangement with him by which the company, its creditors, or the State, shall lose any of the benefit of his subscription. Every such arrangement is regarded in equity, not merely as *ultra vires*," but as unjust to the other stockholders, to the public and to the creditors of the company. (*Burke* v. *Smith*, 16 Wall. 390; *Melvin* v. *Lamar Ins. Co.* 80 Ill. 446; *Bedford Railroad Co.* v. *Bowser*, 48 Pa. St. 29; *Osgood* v. *King*, 42 Iowa, 478).

It is claimed by counsel for appellant that, even if the contract embodied in the resolution is *ultra vires*, the appellee cannot avail itself of the defense of *ultra vires*, where the contract has been in good faith performed by the other party to it, and the corporation has had the benefit of the contract and of the performance. It is true, as a general rule, that a corporation cannot avail itself of the defense of *ultra vires*, when a contract, not immoral in itself nor forbidden by any statute, has been in good faith fully performed by the other party, and the corporation has had the full benefit of its performance. (*Kadish* v. *Garden City, etc. Building Ass.* 151 Ill. 531). But while the rule is, that the executed dealings of a corporation under such a contract will be allowed to stand, yet the rule is otherwise where the contract *ultra vires* remains executory. (*Thomas* v. *Railroad Co.* 11 Otto, 71; *Kadish* v. *Garden City, etc. Building Ass. supra.*) In the latter case, courts will oftentimes interfere to prevent its enforcement. (Ibid). Here, the object of the suit is to recover what is claimed to be due upon the unexecuted part of the contract. Appellant is suing to recover a bonus of two and one-half per cent upon $150,000.00 of stock, which has never been issued, under a contract

which is clearly *ultra vires*, so far as it attempts to control the increase of the capital stock in a manner not authorized by the statute. If this be regarded as a contract merely *ultra vires*, that is, a contract not within the power conferred upon the corporation by the act of its creation, the defense of *ultra vires* is here allowable, as the present action is brought to enforce the executory part of the contract. (*Thomas* v. *Railroad Co. supra*). So far as the executed part of it is concerned, that is to say, so far as appellant has been paid his bonus upon the original issue of $100,000.00 of the stock and upon the second issue of $50,000.00, appellee cannot recover back the amounts thus already paid under the plea of set-off, if the contract be treated as merely *ultra vires* in the sense already stated.

But the resolution here sued upon, regarded as a contract between appellant and the appellee corporation, is a contract which is illegal in its character, and contemplates action which is forbidden by the statute. Such a contract is not merely *ultra vires*, but it is void as against public policy, and will not be enforced in favor of either party to it. Where parties concerned in illegal agreements are *in pari delicto*, the law will not aid either, but will leave them without remedy against each other. (*Bishop* v. *American Preservers' Co.* 157 Ill. 284).

We are, therefore, of the opinion that appellant is not entitled to recover the bonus claimed by him upon the unissued stock, and that, under its plea of set-off, appellee is not entitled to recover back what has already been paid to appellant. It follows, that there was no error in refusing to hold as law the propositions submitted by the appellant to the trial court.

The judgments of the Appellate and circuit courts are affirmed.                *Judgment affirmed.*