*92 N. J. Eq.* Prindiville *v.* Johnson & Higgins.

THOMAS J. PRINDIVILLE, complainant,

*v.*

JOHNSON & HIGGINS, defendant.

[Decided May 2d, 1921.]

1. The power of a corporation to prescribe the terms on which the respective classes of stock are created, and to define, limit and regulate the powers of the corporation, the directors and the stockholders, or any class of stockholders, must be exercised consistently with section 20 of the Corporation act, declaring shares of stock personal property and in subordination to such provision.

2. If a corporation, by providing in its charter that, when a stockholder is not an officer, director or employe, he shall not be entitled to dividends until he surrenders the stock to the corporation and accepts in lieu thereof a ten-year dividend certificate, has arrogated to itself powers not conferred by law or against the policy of the law, redress may be had by the state through the attorney-general, but a stockholder receiving benefits in the past from such provision cannot attack it.

3. A provision in a corporate charter that when stock becomes the property of one not an officer, director or employe, or if any owner of stock of the corporation ceases to be an officer, director or employe, he shall not be entitled to dividends in such stock unless he surrenders the stock and accepts a ten-year dividend certificate, is not in conflict with the policy of the law against restraint of trade.

4. Where shares of stock are unqualified, restraints upon their transfer, by charter or by law, except for convenience of corporate regulations, are in contravention of public policy and void.

5. Where the charter of a corporation provides as above stated a court of equity cannot compel payment of dividends to a stockholder who has ceased to be a director, officer or employe, because to exscind this provision from its charter, or ignore it, would give the stock qualities and characteristics not created by the incorporators or their successors, and would not merely determine, protect and enforce property rights, but would create them.

6. If the provisions of the charter above stated exceeds the powers conferred on the corporation by the Corporation act, a stockholder who has accepted pecuniary benefits thereunder is estopped to attack such proceedings on that ground.

7. If such provision constitutes an unlawful restriction on the transfer of stock, and is void against public policy, a stockholder who has been an active participant in the violation of the law, and who does not offer to restore what he has gained thereunder, is *in pari delicto*, and not entitled to relief in equity.

8. Where the charter of a corporation contained the provisions above stated, a stockholder not complying therewith was not entitled to sue to restrain the corporation from paying excessive salaries to directors, as excessive salaries are in diminution of dividends, and only those entitled to dividends may complain.

On final hearing.

Messrs. McCarter & English (Mr. Henry Wollman, Mr. Royal Victor and Mr. Eustace Seligman, of the New York bar), for the complainant.

Messrs. Pitney, Hardin & Skinner (Mr. A. H. Larkin and Mr. F. W. M. Cutcheon, of the New York bar), for the defendant.

BACKES, V. C.

This is a stockholders' bill, alleging two causes of action; to compel the defendant corporation to declare and pay dividends, and to restrain the directors from paying themselves excessive salaries.

Johnson & Higgins was incorporated in 1899, under "An act concerning corporations" (Rev. 1896), with an authorized capital stock of $500,000—half preferred and half common. The preferred stock is eight per cent., non-cumulative, dividend bearing, with priority over the common, in dividends, and in the capital upon dissolution. The authorized capital stock has been increased to $1,000,000, similarly divided. The preferred stock is not entitled to vote for directors or officers. The principal object for which the company was formed, as stated in the charter, was

"to purchase, acquire and take over the business of the copartnership of Johnson & Higgins, as insurance brokers, insurance agents, agents of underwriters and of insurance companies, adjusters of averages and their kindred business, all as conducted by them in New York and in other places [excepting their business as now conducted in Boston, Philadelphia, Baltimore, New Orleans, Chicago and San Francisco]."

In 1845 Messrs. Johnson and Higgins formed a copartnership to engage in the insurance business as brokers, agents and

adjusters, and prospered, extending their business throughout the nation, and earning for themselves, besides riches, an enviable good will. 1899 the members of the firm, then eight in number (there are now twelve), concluded to incorporate part of their business, and to that end caused the corporation of Johnson & Higgins to be formed, and conveyed to it the partnership business described in the charter, for all the common stock and $50,000 of the preferred. The partners thereupon divided the stock among themselves in proportion to their interest in the firm's business, electing themselves directors, and assumed the management of the company's affairs, which they and their successors have since carried on with marked success. The co-partnership business, not incorporated, continued, and also has been conducted profitably, the members and the board of directors being, as a rule, identical. The corporation was designed to be a strictly personal service concern, a copartnership, as nearly as ingenuity could achieve, and to embody all of the advantages of both, without incurring, in full, the obligations of either. The scheme was simple. The common stock was to be held only by the officers, directors and employes of the company actively promoting its affairs, and among them was to be divided the net annual profits, in part, according to the appraised or real value of their services, and in part according to their stock holdings, and when any of them became inactive, the right to dividends was to cease after the expiration of ten years. To that end it was provided in the charter that—

"In the event that any share or shares of the common stock of the corporation become the property of any person who is not an officer, director or employe of the corporation actively engaged in its service, or in the event that any owner of a share or shares of the common stock of the corporation ceases to be an officer, director or employe of the corporation actively engaged in its service, the owner of such share or shares of stock shall thereby and thereupon be disentitled to dividends upon such stock unless and until he shall surrender or cause to be surrendered the said stock and the certificate therefor to the corporation, upon which surrender he shall receive from the corporation in exchange for such stock a certificate entitling him to such dividends as may be declared upon said stock for the next succeeding period of ten years, and such stock shall from the time of surrender be subject to reissue under the direction of the board of directors and upon any terms approved by them, and with or without specific consideration [any con-

sideration, however, to be the property of the corporation] ; but the new holder or holders of such stock so reissued shall not be entitled to dividends thereon until ten years from the time of the surrender of the stock to the corporation as aforesaid, and prior to the reissue of such stock there shall be written or stamped upon the face of the new certificate or certificates therefor a statement indicating at and after what time the holder of the stock shall be entitled to receive dividends."

For twenty years there was perfect harmony and cohesion. The directors held the common stock during their period of service, and when they ceased to be active they turned in their stock for the ten-year dividend paying certificates, and their places were taken by others. The stock so turned in was reissued to the remaining members, usually in proportion to their holdings. The uniform practice of the directors was to set aside at the beginning of each year one-half of the net profits in prospect, for their compensation; the other half for dividends. Then the amount set aside for salaries was apportioned among the members on a percentage basis, presumably, according to the value of their service.

In 1911, the complainant, Prindiville, was selected a director. He had been engaged in the insurance business in Chicago under the name of Prindiville & Company, a corporation, of which he was half owner, the other half belonging to Johnson & Higgins. His interest was taken over at an appraised value of $12,500, for which he was given one hundred and twenty-five shares in the defendant company of the par value of $100 each. Mr. Prindiville was taken into the corporation, not for his assets in Prindiville & Company, but for his singular excellence in the insurance line, which was calculated to add to the prestige, advancement and success of Johnson & Higgins. That, he and his associates fully understood, and he took his position and his stock, well knowing the plan of operation and the limitation of his status. He continued with Johnson & Higgins, with headquarters at Chicago, until December 31st, 1918, subscribing at all times to its scheme, taking his share of the yearly profits by way of compensation and dividends upon his stock, and also from time to time accepted his allotment of the common capital stock surrendered by his fellow-members of the dictorate who ceased to be active—in all, one hundred and fif-

teen shares. His annual compensation and dividends during his connection with the company were enormous. The profits of the company were fabulous.

His retirement came about in this manner: When America entered the war in April, 1917, he went into the service, without consulting his coworkers and obtaining their leave. They protested, not against his ideals and zeal, but against his arbitrary and abrupt manner of putting country above company. All was smoothed over, however, and throughout his service in the navy, until the end of 1918, he drew his annual compensation as before—and it was princely—and also dividends on his stock for the year 1917, which was no paltry sum. Upon his release by the government, and when he was due to resume his duties as an active director on January 1st, 1919, he demanded an increase in compensation for the year 1919, equal in percentage to that of Lowe and Davy, his so-called "running mates," who had come into the concern with him, but who worked while he was absent. During the period of his absence he drew pay at the rate of six per cent. of the net profits set aside annually for directors' compensation, and the company proposed continuing him at that rate. Lowe and Davy had in the meantime been raised to nine per cent. plus. After considerable controversy, sometimes acrimonious, the directors refused to accede to his demands, and he quit. He then brought this suit to recover dividends aggregating two hundred and five per cent. on the common stock declared out of the profits of 1918. The company stands ready and offers to pay them upon surrender by him of his certificates of shares in exchange for dividend certificates in accordance with the requirements of the charter. This he declines to do, maintaining that the condition is *ultra vires* the corporation, and that it is an unlawful restraint upon the alienation of his capital stock. His contention is, that the Corporation act does not authorize a charter, with limitations upon shares perpetuating the control of the company in the organizers and their chosen successors; that capital stock in a corporation is personal property, so declared by section 20 of the Corporation act; and that inasmuch as the free and untrammeled right of disposition is an essential and in-

alienable incident to ownership of personal property, the requirement of the charter, that he surrender his stock to entitle him to dividends, is in restraint of trade, and void as against public policy. However sound in principle the argument may be, it is weak in appeal and application.

(1) It may well be doubted that a partnership may be perpetuated in the garb of a corporation, with its corporate rights and powers, and immunity to personal liability, without complete submission to its cardinal ordinances, of which a conspicuous one is that "the shares of stock in every corporation shall be personal property" (*Comp. Stat., p. 1610* § *20*), and I seriously question that the provisions of section 8 of the Corporation act countenance corporate existence with copartnership privileges of choosing one's associates. Subdivision 4 requires that the certificate of incorporation contain:

"If there be more than one class of stock created by the certificate of incorporation, a description of the different classes, with the terms on which the respective classes of stock are created,"

and subdivision 7 provides that

"the certificate of incorporation may also contain any provision which the incorporators may choose to insert, for the regulation of the business and for the conduct of the affairs of the corporation, and any provision creating, defining, limiting and regulating the powers of the corporation, the directors and the stockholders, or any class or classes of stockholders; provided, such provision be not inconsistent with this act."

These broad grants of power were intended, in my opinion, to be exercised consistently with the declared policy that "the shares of stock in every corporation shall be personal property," and in entire subordination to this declaration. The point is not, however, up for decision. If the defendant corporation has arrogated to itself powers that are not conferred, or that are obnoxious in the eyes of the law as against its policy, it is guilty of an invasion of the public right, and direct redress lies with the state through its duly-appointed agency—the attorney-general. Strangers may resist their imposition, but the complainant is not in a position to assail them. The charter restric-

tion, of which he complains, forms the very keystone of the corporate scheme and structure he helped build, and under which he holds, and he cannot be heard to obliterate it. He has supped sumptuously at the table of plenty for eight years, and he cannot bring the feast to an end simply because he is indisposed.

(2) The principal point to which counsel have addressed their arguments, orally and in voluminous briefs, is whether the charter provision above quoted, terminating the right to dividends, is in conflict with the policy of the law against restraint of trade, and therefore void; and much that has been said and written, supported by long lines of authority *pro* and *con* the subject, though exceedingly helpful in interpreting the clause, is, it seems to me, beside the question. As I view the clause, it limits the quality of the shares, not their alienability. That is to say, the limitation is upon the property in the shares, their normal dividend bearing capacity is curtailed, but there is no restraint upon their transferability. The shares came into being with this condition as a part of their essence; it was one of their original incidents, and the complainant contracted with the corporation and his fellow-stockholders for them with this inherent characteristic attached. He and his associates are not deprived of the rights or privileges of stockholders, save as to dividends, and those he agreed to forego in a certain contingency, which has come to pass. He got all he bargained for, and what he has he is at liberty to sell and transfer. As to that there is no restriction. He may transfer his shares, such as they are, at will, and to whom he pleases. That he will not be able to find as ready a market or as smart a price as could be secured for shares otherwise unlimited, may be embarrassing and disappointing, but that does not impair the vendibility of the article he bought and has for sale. I can perceive no infraction of public policy.

Where shares are unqualified, full fledged, so to speak, restraints upon their transfer, whether by charter or by-law, except for convenience of corporate regulations, are in contravention of public policy and void. The authorities are unanimous in enunciating this principle, but a call for its application in the

present circumstances is inopportune. The cases cited by complainant are illustrative and conclusive of the doctrine. *Morris v. Hussong Dyeing Machine Co., 81 N. J. Eq. 256; Chouteau Spring Co.* v. *Harris, 20 Mo. 382; Kretzer* v. *Cole Brothers Lightning Rod Co., 193 Mo. App. 99; Fisher* v. *Bush, 35 Hun 641; In re Petition of Klaus, 67 Wis. 401; 29 N. W. Rep. 582; Miller* v. *Farmers Milling & El. Co., 78 Neb. 441; 110 N. W. Rep. 995,* and *McNulta* v. *Corn Bell Bank, 164 Ill. 427; 45 N. E. Rep. 954. Longyear* v. *Hardman, 219 Mass. 405; 106 N. E. Rep. 1012,* cited by the defendant, is not an exception. There the court upheld a charter provision that none of the shares should be sold, hypothecated or transferred without the consent of three-fourths of the capital stock of the corporation. It was held to be valid upon the authority of section 8 (*e*) of the Massachusetts statute, which provides that the articles of association shall state "the number of shares into which the capital stock is to be divided, *and the restrictions, if any,* imposed upon their transfer." Other cases cited by the defendant as recognizing, in a measure, the right of a corporation to control the transfer of shares, will be found to deal with pre-emption rights, or options, reserved to the corporation or to the stockholders, to acquire the shares of a retiring stockholder at a price fixed by a legal standard, as, for instance, the sum he offers to take from another, par, their book value, or what they are reasonably worth, to be determined by appraisers, and the like. Charter provisions of this character, obviously, are not restrictions on the transfer, but conditional contracts of sale, and specifically enforceable as contracts, and were sustained in the cases upon that theory. *New England Trust Co.* v. *Abbott, 162 Mass. 148; 38 N. E. Rep. 432; Nicholson* v. *Franklin Brewing Co., 82 Ohio St. 94; 91 N. E. Rep. 991; Farmers M. & S. Co.* v. *Laun, 146 Wis. 252; Weiland* v. *Hogan, 177 Mich. 623; 143 N. W. Rep. 599; Garrett* v. *Philadelphia Lawn Mower Co., 39 Penn. Sup. 78; Bloomingdale* v. *Bloomingdale, 107 Misc. (N. Y.) 646; Jones* v. *Brown, 171 Mass. 318; 50 N. E. Rep. 648; Borland's Trustee* v. *Steel Brothers & Co., Ltd. (1901), 1 Ch. 279.* See also *Barrett* v. *King, 181 Mass. 476; 63 N. E. Rep. 934; Scruggs* v. *Cotterill, 73 N. Y. Supp. 882,* and *Williams* v.

*Montgomery, 148 N. Y. 519; 43 N. E. Rep. 57.* Authority for the English cases cited by defendant as sustaining liens on shares for debts due the company from stockholders, and upholding refusal to transfer shares while the stockholder is indebted to the corporation, may be found in the Companies act of 1862 (*25 & 26 Vict. 798*), section 14 of which provides that the companies may in their articles of association "adopt all or any of the provisions contained in the table marked A in the first schedule hereto." Paragraph 10 of the schedule reads: "The company may decline to register any transfer of shares made by a member who is indebted to them." Banking companies are subject to the company legislation of 1862. *1 Hals. L. Eng. 582.* See *New London and Brazilian Banking Co.* v. *Brocklebank, 21 Ch. Div. 302; Brandford Banking Co.* v. *Henry Briggs Son & Co., Ltd., 12 App. Cas. 29.*

(3) Furthermore, to exscind from the charter the limitation upon the right to dividends, or to ignore it altogether—and that is really the complainant's aim—would evolve property by judicial decree that had never been acquired by complainant, nor created by the parties, incorporators and their successors, nor had ever been within the contemplation of either. By the new order of things thus to come into being, the complainant's shares —not only those which he acquired by his initial purchase from the company, but also those that were allotted to him through the corporate scheme he now denounces—would take on qualities and characteristics for which no warrant can be found in his engagement. By the magic stroke of the judicial pen, so to speak, that which was a conditional fee would be metamorphosed into an absolute estate, if I may indulge in those terms; the shares would become perpetually dividend bearing, translated from choses in action to things in possession, as it were, and this, not by virtue, but in spite of the complainant's undertaking. Equity determines, protects and enforces property rights, it never creates them.

(4) Now, if we were to accept the complainant's contention and argument at face value, and as sound (*a*) that the Corporation act does not grant charter privileges of conditional shares such as the defendant's articles of incorporation presume to

appropriate, and (*b*) that the conditions imposed on the shares are unlawful restrictions upon their transfer, and void as against public policy, it would not be to his advantage or helpful to him in the least in maintaining this suit. In setting up the first proposition he is met by an equitable estoppel, or an estoppel in the nature thereof, and the doctrine finds excellent expression in the opinion of Mr. Justice Willard Bartlett in *Wormser* v. *Metropolitan Street Railway Co., 184 N. Y. 83*, as follows: "Where the objection to the acts of a corporation is that they are *ultra vires,* without being either *mala prohibita* or *mala in se,* a stockholder cannot maintain an action in his own behalf based on such objection, where he, himself, with knowledge of the character of the act, has acquired and accepted pecuniary benefits thereunder. Whether his conduct in so doing constitutes an estoppel, in the strict sense of that term, or a *quasi*-estoppel, as Mr. Bigelow puts it (*Big. Estop. (4th ed.), ch. 19*), or be denominated merely an acquiescence or an election, or the assumption of a position inconsistent with an attack, makes no essential difference here. The point is, that the seeking and acceptance of a substantial benefit which would be unavailable to the stockholders except as a result of the acts which he would attack as *ultra vires* preclude him from assailing those acts on that ground. A litigant is not at liberty to deny the validity of a contract, which is neither prohibited by law nor evil in itself, after he has knowingly sought and obtained pecuniary advantages, pay or compensation, under and by virtue of such contract." See also *Treadwell* v. *United Verde Copper Co., 134 App. Div. 394; Bonta* v. *Gridley, 77 App. Div. 33,* and cases cited. As to the second, the complainant was a party to the wrongful imposition upon the statute, and an active participant in the violation of the law, and he stands before the court guilty, by his own confession, of transgressing the law by the acts which he himself now condemns as vicious and injurious to the public weal. He comes not in a penitent mood to restore what he gained by the unlawful means and to retrace his steps to virgin soil—*locus penitentis*—but as an unregenerated sinner praying the court to help him to more. Where the parties to the litigation are equally guilty in the execution of an unlawful venture,

equity will help neither. Its strong arm becomes limp, as of paralysis, and it pronounces upon them its invariable sentence, *in pari delicto potior est conditio defendentis*. In *St. Louis Railroad Co.* v. *Terre Haute Railroad Co., 145 U. S. 393*, Mr. Justice Gray, in applying the doctrine, said: "The general rule, in equity as at law, is *in pari delicto potior est conditio defendentis;* and, therefore, neither party to an illegal contract will be aided by the court, whether to enforce it or to set it aside. If the contract is illegal, affirmative relief against it will not be granted, at law or in equity, unless the contract remains executory, or unless the parties are considered not in equal fault, as where the law violated is intended for the coercion of the one party and the protection of the. other, or where there has been fraud or oppression on the part of the defendant." See *Harriman* v. *Northern Securities Co., 197 U. S. 244;* Arnot v. *Pittston & E. Coal Co., 68 N. Y. 558;* Leonard v. *Poole, 114 N. Y. 371;* Unckles v. *Colgate, 148 N. Y. 529;* Knowlton v. *Congress, &c., Spring Co., 57 N. Y. 518; 103 U. S. 49*, cited in *197 U. S. 244;* Gould v. *Head, 41 Fed. Rep. 240;* Continental Securities Co. v. *Northern Securities Co., 66 N. J. Eq. 274.*

(5) The complainant's second cause of action—to restrain the corporation from paying the directors excessive salaries in the future—is, in view of the foregoing conclusion, not ripe for decision. Excessive salaries are in diminution of the dividends, and only those who are entitled to them may complain of their deprivation. The complainant sues only in right of the one hundred and twenty-five shares originally purchased by him, and as to these he has lost his claim to dividends, only to be restored upon the surrender of his shares, and to be vouched to him by a ten years' certificate. When he shall have complied with his contract and assumes the status of a dividend certificate holder he will then, and not until then, be in a position to complain that he is deprived of his just share of the company's profits.

The bill will be dismissed, with costs.