# George Adams v. John C. Burke.

1. CORPORATIONS—*Salaries Illegally Voted to Directors.*—Where a salary or compensation is voted to a director, the vote is illegal, if it is carried only by including the vote of the director who receives the salary or compensation.

2. SAME—*Where the President Induces the Directors to Vote a Salary to Him.*—Where the president, who is a chief stockholder in a corporation, induces the directors to vote a large salary to him, the corporation may defeat him in an action at law to recover it.

3. SAME—*Power of the Directors to Vote Compensation to One of Their Number.*—Directors can not vote a salary, much less a large bonus or compensation in addition to a salary to one of their number, as president, when he takes part in the proceedings, or his vote is essential to the adoption of the measure.

4. SAME—*Salaries Illegally Paid to be Treated as a Fund out of Which a Dividend May Be Declared.*—A salary illegally paid to a director or officer of a corporation is to be treated as in the nature of a fund out of which a dividend may be declared.

**Bill for an Accounting.**—Appeal from the Circuit Court of Cook County; the Hon. ELBRIDGE HANECY, Judge presiding. Heard in this court at the October term, 1901. Affirmed in part and reversed in part. Opinion filed May 22, 1902.

M. B. & F. S. LOOMIS, attorneys for appellant.

GEORGE W. PLUMMER and WHARTON PLUMMER, attorneys for appellee.

MR. JUSTICE ADAMS delivered the opinion of the court.

June 17, 1897, the appellee filed a bill against appellant and the George Adams and Burke Company, and subsequently an amended bill, and lastly a supplemental bill, by amendment to which W. E. Brainard, F. W. Tubbs and C. F. Thompson were made parties defendant. Issues were made up on these pleadings, and the cause was referred to a master to take proofs and report. It not being objected that the allegations of the complainant's pleadings are not sufficient, if proved, to sustain a decree in his favor, we deem it unnecessary to state the pleadings. The record is very voluminous, but much of it is irrelevant to the questions pre-

sented here, owing to the fact that, by stipulation between the parties, while the cause was pending in the Circuit Court, all matters were eliminated from the litigation except a certain claim of the complainant for interest, a claim for a proportionate share of certain salaries, and a claim for a proportionate share of certain commissions. The master found and reported against these claims; but the court, on exceptions to the report, found and decreed in favor of complainant's claims for a proportionate share of appellant's salary and a proportionate share of commissions, but sustained the master's report as to the claim for interest. The complainant, appellee here, has not assigned cross-errors, and has abandoned his claim for interest, thus leaving for decision only his claim for a proportionate share of salaries, and a proportionate share of certain commissions. These questions will be considered in the order stated.

Appellant and appellee, having been acquainted for some years, formed a partnership under the firm name "George Adams & Burke," March 1, 1882, in the general livestock commission business, in Cook county, Illinois, the partnership to continue as long as should be mutually agreeable. By the terms of their partnership agreement, which was reduced to writing, Adams was to furnish all necessary money to run the business, each of them to "donate his time to the business and to the care and management thereof," three-fourths of the profits to go to Adams and one-fourth thereof to Burke, and losses to be borne in like proportion; expenses to be borne equally; neither to draw from capital stock more than his share of profits earned. Adams attended to sales of cattle and Burke to sales of hogs, and the former, being the financial man of the firm, had charge of the office and gave directions as to how the books should be kept. The partnership continued until about April 30, 1894. During the partnership the yearly profits were very large, the smallest yearly profits being $23,920.17, and the largest $52,310.81. There is nothing in the evidence which indicates that during the partnership there was any disagreement or trouble between the parties.

About February, 1894, Adams suggested to Burke the changing their partnership to a corporation, to do which Burke at first hesitated, but finally agreed to it. Burke testified that when Adams approached him in reference to organizing a corporation, he said that Thompson, his son-in-law, and defendant herein, had suggested that it would be better. Thompson testified that he told appellant "the office of a corporation, and the liability, and what they were adapted to."

April 30, 1894, a certificate of complete organization was issued to the "George Adams & Burke Company." The articles of incorporation show as follows: Name of corporation, George Adams & Burke Co.; capital stock $100,000, divided into one thousand shares of $100 each; location of office, Chicago, Illinois. George Adams subscribed for 748 shares, John Burke, for 249 shares, and William R. Smith, Robert S. Murray and W. E. Brainard each for one share. Adams paid for his shares, and the stipulation heretofore referred to being that all matters, except the claims heretofore mentioned, were fully settled and adjusted between the parties, it may be assumed that Burke has paid for his shares. Smith was a sheep salesman, employed by Adams & Burke July 17, 1882, and who remained with that firm in that capacity until the formation of the corporation, and with the corporation until April 30, 1897. Brainard was a hog salesman employed by Adams & Burke February 15, 1890, and afterward, in the same capacity, by the corporation. Murray was employed by Adams & Burke as a cattle salesman. Smith, Brainard and Murray were employed on salaries. Smith testified that Adams asked him to sign his name as one of the corporators; that he at first objected, but Adams told him it was simply a matter of form; that subsequently, Adams asked him to subscribe for one share of stock, and that he, witness, laughed and asked, "What is the meaning of this?" and Adams said, "We have to have five directors, and this share of stock entitles you to become a director, and I am going to make you one of the directors, so that you can vote;" that he,

witness, wrote his name on a transfer slip on the share; that he was asked so to do by Adams and Callender, and that was the last he ever saw of the stock; that it was never delivered to him; that he never paid for it, and never received any dividends on it.

Brainard testified that he was one of the original incorporators; that he subscribed for one share and it was issued to him May 1, 1894, and that he paid for it in April, 1898; that he got a dividend on it in June, 1898 (which was about a year after bill was filed), but none before that time.   On being asked if the stock was not retained by the company, and that he did not get it till April, 1890, he answered that he could not tell anything about it; that Mr. Callender (bookkeeper of the company) has had it in an envelope ever since it was issued to him; that his, witness', name was signed on the back of it; that they asked him to so sign his name, but he could not tell why he did so.

Murray testified that there was a share of stock delivered to him, made out in his name, which he signed over to Adams, by direction of Adams and Callender; that he did not take the stock away with him; that he never saw it afterward, and did not pay for it or receive any dividends on it.

The first directors elected were George Adams, John C. Burke, William R. Smith, Robert S. Murray and William E. Brainard.   George Adams was elected president and treasurer, and John C. Burke vice-president and secretary.

The corporation adopted certain by-laws, section 5 of article 1 of which is: "No officer of this corporation shall receive any salary or compensation for his services as such officer."   The corporation year commenced May 1st and ended April 30th, and the profits for the years mentioned were:

For year ending April 30, 1895..    $31,525.19  
"      "      "      "      " 1896..    25,443.64  
"      "      "      "      " 1897..    32,662.14  
"      "   1897 and 1898, up to  
      March 17, 1898......    30,329.34

Prior to November 2, 1896, Adams drew out from profits $600 and Burke $200 per month. At a special meeting of the board of directors held November 2, 1896, a resolution was passed directing the officers of the corporation to declare and pay, on the first of each month, a dividend of one and one-fifth per cent on each share of stock. After the passage of this resolution, Adams drew $900 and Burke $300 per month. At a special meeting of the directors, April 30, 1897, present George Adams, W. R. Smith, W. Montgomery, and W. E. Brainard, Burke absent, a resolution, moved by Brainard and seconded by Montgomery, was passed, repealing the by-laws adopted May 1, 1894, and adopting in their stead new by-laws. Among the new by-laws adopted there is no provision such as section 5 of article 6 of the original by-laws, prohibiting officers from receiving salary or compensation for their official services.

At a regular meeting of the board of directors May 1, 1897, present George Adams, F. W. Tubbs, W. Montgomery and W. E. Brainard, on motion of Tubbs, seconded by Montgomery, Brainard was elected temporary secretary, after which, on Tubbs' motions, seconded by Montgomery, Adams was elected president and treasurer and Thompson secretary, and, also on motion of Tubbs, seconded by Montgomery, the resolution of November 2, 1896, authorizing 1 1-5 per cent per month dividend on each share of stock, was repealed. As before stated, the profits of the corporation for the year ending April 30, 1897, were $32,662.14, and for the next corporation year up to March 17, 1898, they were $30,329.34.

At a special meeting of the board of directors January 4, 1898, present George Adams, W. E. Brainard and F. W. Tubbs, the minutes show Montgomery's written resignation was tendered and accepted; the secretary reported an offer of Montgomery to sell his stock, and the same was sold to C. F. Thompson, Jr.; on motion of Tubbs, seconded by Montgomery, Thompson was elected a director to fill the unexpired term of Montgomery, and on motion of Tubbs, seconded by Montgomery, a resolution was passed that, from

Adams v. Burke.

and after January 4, 1898, the president and treasurer should be allowed and paid $1,000 per month salary, and the secretary $100 per month salary.   May 1, 1895, at the annual meeting of the board of directors, a motion was made and carried that the net earnings of the past year, being $31,335.57, should be divided.   At the annual meeting of the board May 8, 1896, it appearing that there was a balance not drawn out of $11,043.64; a dividend of that balance was declared.   This was the last dividend declared, although the profits of the company for the year ending April 30, 1897, were $32,683.53, and the net earnings for the year ending April 30, 1898, as shown by a report of Adams, were $27,307.47.   The last money received by Burke on his shares he received April 1, 1897, which was the last time the dividend of 1 1-5 per cent per share was paid, that dividend having been cut off by the resolution adopted at the meeting of May 1, 1897.

Shortly before the first of April, 1897, appellee Burke, by request of Adams, went to Omaha and Kansas City on business of the company.   He was absent from Chicago about three weeks, and while absent he was taken very sick, was brought back on a stretcher, and was ordered to the hospital to be operated on for gallstones.   He was sick in all about two months, and consequently was absent from the important meetings of April 30 and May 1, 1897.   He testified that, in about two weeks after he returned, and while he was in the hospital, Adams called at the hospital and informed him that they had had a meeting and had elected a new secretary, his son-in-law, in his, Burke's place, and that when he asked Adams what necessity there was for holding a meeting before he could get out, Adams said it should be held the first of the month, when he replied, not necessarily, and Adams said it was a mere matter of form, that he, Thompson, was only a figurehead, and didn't cost anything; that he might just as well do it as not. Adams denies that he said of Thompson what Burke testified to.   There is no evidence that the George Adams & Burke Company, defendant, was or is insolvent, and the

evidence tends to show the contrary. Appellant's counsel contend that the resolution authorizing salaries to be paid to Adams and Thompson is legal; that if not legal in the first instance, it became so by ratification; and that, in any event, Adams was entitled to compensation for services performed. We have seen that the directors present at the meeting of January 4, 1898, were Adams, Brainard, Tubbs and Adams' son-in-law, Thompson, who was elected a director at that meeting, and that the motion to allow and pay salaries was made by Tubbs and seconded by Brainard. It has already been shown that Brainard was a hog salesman first for George Adams & Burke, and afterward for the George Adams & Burke Company, and also the slight claim he has to be considered a *bona fide* shareholder. It remains to examine the titles of Tubbs and Thompson to be considered *bona fide* shareholders. Tubbs testified that he was employed by the company May 1, 1897, as sheep salesman, taking the place of William R. Smith, who quit the employ of the company April 30, 1897; that Adams asked him if he would like to become a stockholder, and he said he would, and Adams said he would like for him to have one share, and that the stock was issued to him just before his employment commenced; that he didn't pay for the stock, and told Adams he couldn't then do so, and Adams said he would carry it until such time as he, Tubbs, could pay for it; that he signed the stock in blank, and that subsequently, about April, 1898, about three months after the meeting of January 4th, at which salaries were voted, and nearly a year after the bill was filed, he paid for the stock. He don't tell us whose money he paid, if any, nor did he produce the stock. Robert S. Murray was a subscriber for one share of stock. There is no evidence that he ever paid for or owned it. He testified that when it was issued, he signed it and turned it over to Adams, by Adams' direction; that he has never since seen it, and has received no dividends on it. The minutes of the meeting of the board of directors May 1, 1895, show that William Montgomery was elected a director in place of Murray, resigned. The minutes of the

meeting of January 4, 1898, show the tender and acceptance of Montgomery's resignation, and the following: "The secretary then reported to the directors that Mr. Montgomery offered to sell the stock held by him in the company; that his price for same was $100 per share, and that any stockholder present was privileged to buy the same at the price named by him. None of the stockholders present desired to buy the stock, and the same was sold to C. F. Thompson, Jr. Where Montgomery got his stock, if he had any, does not appear, but it may be inferred that he succeeded to such title as Murray had, and which Murray described as above stated. Thompson testified that he prepared the new by-laws and was present at the meeting of April 30, 1897, when they were adopted; that six months or more thereafter, he bought a share of stock from Montgomery and paid Adams for it; "Mr. Adams settled with Mr. Montgomery, I think." Mr. Montgomery was not present at the meeting of January 4, 1898, and there is no evidence that any share of stock was produced, delivered to any one, or paid for at that meeting. That Adams and Burke owned all the stock, and that the three shares nominally subscribed for by others were reserved as mere pedestals on which to set up dummy shareholders and directors, is evident from the record. The following occurred in the examination in chief of appellant, Adams:

Q. "Burke testifies again, among other things, that speaking about his stock and yours, having the stock with his notes, that you said you would not leave that stock worth a cent; you would enter up salaries and expenses, and would not leave it worth a copper; would not let anybody get a cent out of it; striking your hand down on the table in your usual way, etc.; that you would not leave it worth a dollar. Did you tell him that?" A. "I never did. I would not want to throw $75,000 of mine away to make his $25,000 worth nothing."

Adams, in so answering, clearly assumed that he owned 750 shares of the stock, and Burke the remaining 250 shares; that between them they owned all the stock.

After the organization of the corporation, Adams and

Burke treated the corporation as a continuance of the partnership, in which the former had a three-fourths and the latter a one-fourth interest, and, as between themselves, are to be treated as partners. Adams, in a report signed by him, calls the company "a close corporation."

The affairs of the corporation were conducted on the hypothesis that Adams owned three-fourths and Burke one-fourth of the stock. When money was drawn from profits prior to a declaration of dividends, Adams drew $600 and Burke $200 per month; when the resolution authorizing dividends of one and one-fifth per cent per share monthly was in force, Adams drew $900 and Burke $300 per month, and when, prior to that time, dividends were declared, they shared in the same proportion, and an exhibit put in evidence by appellant shows that losses were shared between them in the same proportion, both while the partnership of Adams & Burke was in existence, and after the corporation was organized. No dividends were paid to the nominal owners, one share each, of the three shares. Therefore the directors present at the meeting of January 4, 1898, who were unanimously voted salaries, may be thus described: George Adams, owner of 750 shares of stock; Tubbs, sheep salesman, Brainard, hog salesman, and Thompson, Adams' son-in-law, no shares. The evidence shows that the last three were controlled by Adams and subservient to his wishes. Adams presided at the meeting and voted, and the minutes are signed by him. In effect, he voted his own salary. That the salary was illegally voted, and the action of the directors in that respect void, is unquestionable. In McNulta v. Corn Belt Bank, 164 Ill. 427, McNulta, the president, owned nine-tenths of the stock, and ten others the other tenth. He and the other shareholders were directors, and at a meeting of the directors, he being present, the directors voted him a salary, and, in addition thereto, a further compensation. The court say, Ib. 448:

"The law is, that where a salary or compensation is voted to a director, the vote is illegal if it is carried only by including the vote of the director who receives the pay

Adams v. Burke.

or salary. (1 Cook on Stock, etc., Sec. 657.) Where the chief stockholder, who is president, induces the directors to vote a large salary to him, the corporation may defeat the officer's action at law to recover it. (Ibid.; also Miner v. Ice Co., 93 Mich. 97.) Directors can not vote a salary, much less a large bonus or compensation in addition to a salary, to one of their number, as president, when he takes part in the proceedings, or his vote is essential to the adoption of the resolution. (Wickersham v. Crittenden, 93 Cal. 17, and cases cited; Gridley v. L. B. & M. Ry. Co., 71 Ill. 200.)" See, also, Beers v. N. Y. L. Ins. Co., 66 Hun, 75, 87.

But counsel for appellant say, the action of the directors at the meeting of January 4, 1898, was ratified by the stockholders at their next annual meeting. It appears from the record that the record of the stockholders' meeting referred to was offered in evidence, but the minutes of the meeting are not abstracted, nor can we find them in the voluminous record before us. We know, however, that the shareholders were the same persons who voted the salaries, and it is to be inferred from the record that Burke never, in any way, assented to their action in that regard.

The minutes of the meeting of the board of directors, May 2, 1898, which was the regular meeting of the board next after January 4, 1898, recite that "immediately upon the adjournment of the annual meeting of the stockholders, held on May 2, 1898, a meeting of the new board of directors of the corporation was convened." At the meeting of the board May 2, 1898, there were present, directors Adams, Burke, Tubbs, Brainard and Thompson. The minutes show the following :

"Mr. Burke then made the following motion, which received no second :

'I move that a dividend of all the cash of the company now on hand be made at once. I demand that a dividend of the cash of the company be at once made and that the amount of the dividend coming to me be applied to the payment of the judgment against me, and that the levy on my real estate in Indiana be released.'

Mr. Burke then made the following motion, which received no second :

'I move that the salaries of the president and secretary be returned to the company, and that no salaries be paid.'"

In view of these motions, it is not to be presumed that appellee Burke participated in any ratification of the acts of the board at the meeting of January 4, 1898. If any of the shareholders attempted to ratify the proceedings of that meeting, they were the directors who voted at the meeting, and their attempted ratification was ineffective. McNulta v. Corn Belt Bank, 164 Ill. 448, 449.

But it is claimed that, even though the vote granting appellant a salary was void, he is entitled to some compensation because his official duties were increased by appellee abandoning active participation in the affairs of the company. As to the alleged abandonment, the evidence is that appellee was engaged in the business of the company when taken sick, and that while he was sick, and at the hospital, he was removed from his office of secretary, and the monthly dividend of one and one-fifth per cent per share was cut off. The cause was tried in the lower court by appellant's counsel solely on the theory that the salary was legally voted and appellant entitled to it, and no evidence was offered of the value of extra official services, if any, performed by appellant. We can not concur in the contention of counsel. It is urged that the monthly one and one-fifth per cent per share was declared in lieu of salary. This contention can not prevail for several reasons. When that dividend was declared, section 5 of article 1 of the original by-laws, prohibiting the receipt of salaries by officers, was in full force, and the board of directors could not do indirectly what the by-law prohibited them from doing directly. There had been no salaries in lieu or instead of which the one and one-fifth per cent dividend could be. The resolution in respect to that dividend expressly directed that the dividend should be charged to dividend account on the books of the corporation.

A supplemental bill was filed May 18, 1898, alleging matters which had transpired after the filing of the original bill; among them, the salary matter. It is recited in the decree that the parties entered into and filed the following stipulation :

" It is hereby stipulated and agreed by and between the parties hereto and their respective solicitors, that on the hearing of the cause before his Honor, Judge Hanecy, on exceptions to the master's report, the claim of complainant relating to the salaries of George Adams and Charles F. Thompson, Jr., respectively president and secretary of the George Adams & Burke Company, may be heard and determined by the court as including the full period for which said salaries were paid, to wit, from January 4, 1898, to December 28, 1900, the same as if the complainant had filed a second supplementary bill for and on account of said salaries paid after the filing of the first supplemental bill," etc.

The court found that from January 4, 1899, to December 28, 1900, salary had been paid to appellant amounting to $35,600, and that appellee was entitled to 249-1000 of that amount or $8,914.20, with interest, and decreed that appellant should pay the same to appellee. We think the decree in respect to the salary fully warranted. The court treated the illegal salary paid to appellant as in the nature of a fund, out of which a dividend should be declared, as the court, in Brown v. DeYoung, 167 Ill. 549, held should be done in such case.

Appellee claims his proportionate share of commissions on sheep shipped by J. B. Long & Co. to Roddick & Son, Liverpool, England, between February 1, 1894, and November 1, 1896, claimed to have been earned partly by the firm of George Adams & Burke, and partly by the George Adams & Burke Co. J. B. Long was a member of several firms engaged in the purchase and sale of sheep, and during the time his various firms did business with George Adams & Burke and the George Adams & Burke Co., they shipped sheep to the said partnership and company to Chicago, on which they paid commissions amounting to $35,725. George Adams became a partner of Long prior to February 1, 1894, in the sheep business, under the firm name of J. B. Long & Co. George Adams furnished the money to buy and feed the sheep and Long attended to the active part of the business, purchasing, feeding and shipping. Between February 1, 1894, and November 1, 1896, large numbers of sheep were

purchased by Long for J. B. Long & Co., and were shipped by him directly to Liverpool, consigned to Roddick & Son, commission merchants, for sale. The sheep did not pass through the Union Stock Yards in Chicago, nor were they handled by the George Adams & Burke Company. No commissions were ever paid to George Adams & Burke, or to the company, on the sheep shipped to Liverpool. The great preponderance of the evidence is that a broker is entitled to commissions on sales by him of live stock, or on stock on which he makes advances of money, but not otherwise; that if he neither sells nor advances money on the stock, he is not entitled to commissions.

Appellee's claim is based solely on evidence that J. B. Long & Co. drew drafts on the George Adams & Burke Co. for freight, and also to pay for the sheep, which drafts were honored. Burke testified that he had nothing to do with the drafts on the foreign shipments. C. H. Callender, cashier and bookkeeper for the George Adams & Burke Co., called as a witness for complainant, testified that drafts accepted by the company, on account of the foreign shipments of J. B. Long & Co., were met by the personal checks of George Adams; that Adams gave his personal check to meet each draft so accepted, and that the money was advanced by Adams personally to pay each draft. Neither Burke nor any other witness denies the testimony of Callender that the drafts were paid with Adams' money. Callender further testified that Burke knew that the J. B. Long & Co. account was one in which the company was not interested, except for commissions for sales at the stock yards, and also that the J. B. Long & Co. sheep account was one in which Adams was personally interested, and that he personally, and not the firm or company, made the advances; also that Burke knew that no commission was to be charged on the J. B. Long & Co. foreign shipments, and that he, witness, showed to Burke, from time to time, that Adams was putting in his personal checks against all drafts drawn on that account.

George Adams testified that he personally furnished the

Adams v. Burke.

money to carry on the Liverpool deals; that his arrangement with Long was that he, witness, would furnish the money, and Long was to do the work, the profits to be divided equally; that he consulted with Burke and told of his arrangement with Long, and that on sheep shipped to Chicago by Long & Co., and sold in Chicago, commissions would be charged, but that on sheep shipped by that firm to the Liverpool market no commissions would be charged, and that Burke said that was all right. Long testified that George Adams furnished the money on account of the sheep shipped to Liverpool, and that he, Long, did the shipping, and that the George Adams & Burke Co. had nothing to do with it.

It appears from the evidence that an account was kept in the company's books called the " George. Adams Sheep Account," in which Adams' debits and credits on account of the sheep shipped to Liverpool was kept. Burke denied that he knew anything of the J. B. Long & Co. Liverpool shipments until after an examination of the company's books by an expert, in preparing for the cause. No commissions on the sheep shipped by Long & Co. to Liverpool have been paid to George Adams or to the defendant company. John B. Long, partner of appellant, is clearly interested in the question whether his firm is liable for such commissions, and he is not a party to the cause. Waiving, however, the question whether, under the circumstances stated, the bill could be maintained against appellant for commissions, we are of opinion, after careful reading and consideration of the evidence, that appellee's claim for commissions is not sustained by the evidence, and that the master's finding against such claim should have been affirmed.

We find no error in the refusal of the court to re-refer the cause to the master, or in the decree as to fees and costs. The court found due to appellee, Burke, from appellant, the sum of $1,122.74, as appellee's proportionate share of commissions, and the further sum of $9,566.54 as appellee's proportion of salary paid to appellant, less $250, appellee's proportion of the master's fees, being in all the sum of

$10,439.28, and decreed accordingly. The decree will be reversed as to the sum of $1,122.74, decreed as appellee's proportionate share of commissions, and affirmed as to the remainder, $9,316.54.

Affirmed in part and reversed in part.