ELIZABETH ADAMS, Exrx.

*v.*

JOHN C. BURKE.

*Opinion filed February 18, 1903.*

1. CORPORATIONS—*when resolution voting salary to officer is illegal.* A resolution by which a salary or compensation is voted to an officer of a corporation is illegal if it is carried by his vote; and it is equally illegal if procured by his influence, although enough directors voted for it to carry it without counting him.

2. SAME—*when stockholder is entitled to have his proportionate share of officer's salary refunded.* If a resolution voting a salary to the president of a corporation, holding nearly three-fourths of the stock, is passed by his vote and the votes of three "dummies," holding one share each, at a meeting held in the absence of the other stockholder, who held one-fourth of the stock, the latter may have his proportionate share of such salary refunded to him.

3. SAME—*when transaction is not a corporate affair.* The advancement of money by the president of a corporation engaged in the stock business to a commission firm of which he was a member, for the purchase of sheep to be exported and sold on commission, will not entitle a stockholder of the corporation to a share of the commissions on such sales, even though drafts for such advancements, which were paid by the president's personal check, were in fact drawn against the corporation.

*Adams* v. *Burke,* 102 Ill. App. 148, affirmed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. ELBRIDGE HANECY, Judge, presiding.

M. B. & F. S. LOOMIS, for appellant.

GEORGE W. PLUMMER, and WHARTON PLUMMER, for appellee.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

The appellee, John C. Burke, and George Adams, were partners, under the name of George Adams & Burke, in the live stock commission business at the Union Stock

Yards at Chicago, Illinois, from March 1, 1882, until April 30, 1894, under written articles of co-partnership, by which Adams was entitled to three-fourths of the profits and Burke to one-fourth. The partnership was converted into a corporation April 30, 1894, under the name of the George Adams & Burke Company, and the capital stock was fixed at $100,000, divided into one thousand shares of $100 each. The interests of the parties in the capital stock and profits were the same as in the partnership, George Adams taking seven hundred and forty-eight shares and Burke two hundred and forty-nine, while three shares were kept out to complete the corporation, and subscribed for by William R. Smith, Robert S. Murray and W. E. Brainard, three employees of the corporation. The business was continued as before, and differences having arisen, the original bill in this case was filed in the circuit court of Cook county by Burke on June 17, 1897. The bill was subsequently amended and a supplemental bill was also filed. The defendants were George Adams, president of the corporation, and W. E. Brainard, F. W. Tubbs and C. F. Thompson, Jr., the employees who then held the three shares of stock above referred to. The suit involved various questions, but all the matters in controversy were settled and adjusted by the parties by a stipulation, except three claims of Burke. One of these was for the recovery of a proportionate share, according to the amount of his stock, of the interest received by Adams on moneys advanced to customers; a like proportionate share of commissions on sales of sheep belonging to the firm of J. B. Long & Co., sold in Liverpool, England, and the same proportionate share of the salary voted to and received by Adams as president of the corporation. The cause was brought to issue by answers to the amended bill and supplemental bill, and was referred to a master in chancery, who took evidence and reported adversely to the claims of Burke. The case was heard by the chancellor on exceptions to

the master's report. The report was confirmed so far as it related to the claim for interest, but the exceptions were sustained to the master's findings concerning the commissions and the salary paid to Adams. A decree was rendered in favor of Burke for $908.85, with interest thereon at five per cent from July 1, 1896, on account of the commissions, and for $8914.20, with interest at five per cent, on the monthly payments of salary, from the times when such payments were made. An appeal was taken by Adams to the Appellate Court for the First District, and while the cause was pending in that court he died, and the appellant, Elizabeth Adams, executrix, was substituted. In the Appellate Court Burke assigned no cross-errors, but abandoned his claim for interest, and the court reversed the decree as to the proportionate share of commissions on the sales of sheep at Liverpool, but affirmed it as to such share of the salary collected by Adams as president. This appeal was taken from the judgment of the Appellate Court, and the appellant, Elizabeth Adams, executrix, assigns error upon the judgment so far as it affirmed the decree of the circuit court, while the appellee, John C. Burke, assigns a cross-error on the judgment so far as it reversed such decree.

Of the numerous questions originally involved, but two remain. The first relates to the legality of the proceedings by which the salary was voted to Adams, and the facts necessary to an understanding of that question are as follows: The articles of co-partnership between Burke and Adams provided that Adams should furnish all necessary moneys to run the business; that each party should devote his time to the business, and the profits should be divided, three-fourths to Adams and one-fourth to Burke. Adams was at the head of the cattle department, Burke was at the head of the hog department, and they had a man at the head of the sheep department, and other employees. They drew money out of the business, monthly, for their expenses, substantially in proportion

to their interests. The business was very profitable, and the net yearly proceeds averaged about $36,000. In the spring of 1894 Adams proposed to change the partnership into a corporation, giving his reasons therefor, the principal of which was, that in case of the death of either the business could be readily settled and adjusted, and complainant reluctantly consented to the change. The stock was subscribed for in the same proportion that they had been interested in the partnership, except as to the three shares, of $100 each, subscribed for by their employees. When the corporation was organized, by-laws were adopted, among which was a provision that no officer of the corporation should receive any salary or compensation for his services, as such officer. The business continued to be prosperous, with very large profits, and up to November 2, 1896, Adams drew out $600 per month and Burke $200 to meet their expenses. At the above date a resolution of the board of directors was passed directing the officers of the corporation to declare and pay on the first of each month a dividend of one and one-fifth per cent on each share of stock. After the passage of this resolution Adams drew $900 per month and Burke $300, but no dividends were ever paid on the three shares of stock held by the hired men. The board of directors consisted of five persons, and Adams and Burke were always two, while the other three were always employees of the corporation, each supposed to represent one share of stock. On April 30, 1897, shortly before the original bill was filed in this case, a special meeting of the board of directors was held in the absence of Burke, at which Adams and the three employees acting as directors were present. The by-laws originally adopted were repealed and new by-laws were adopted, substantially the same as the former, except that the provision prohibiting the officers from receiving salaries was omitted. The board of directors met again in regular session the next day, May 1, 1897, in the absence of Burke, when

Adams was elected president and treasurer, his son-in-law, Thompson, was elected secretary, and the resolution authorizing the payment of monthly dividends was repealed. After the bill was filed a special meeting of the board of directors was held January 4, 1898, at which there were present Adams, W. E. Brainard, the hog salesman, and F. W. Tubbs, the employee who had succeeded W. R. Smith as sheep salesman and succeeded to his share of stock. The resignation of W. Montgomery, an employee who had been acting as director, was accepted, and the record recites that Montgomery offered to sell his share of stock for $100, and it was sold to Thompson, the son-in-law. On motion of Tubbs, Thompson was then elected a director, and the following resolution was adopted:

"*Resolved*, That from and after this date [January 4, 1898,] the president and treasurer of this company be allowed and paid a salary of $1000 per month."

A salary of $100 per month was also voted to Thompson as secretary, and its legality was questioned by the bill but is not now involved. The resolution was unanimously adopted; Adams and his men voting for it.

The law is, that where a salary or compensation is voted to an officer, the resolution is illegal if it is carried by his vote or produced by his influence, where he has a controlling interest. (*McNulta* v. *Corn Belt Bank*, 164 Ill. 427; Cook on Stock and Stockholders, sec. 657.) It makes no difference that there are enough directors voting for the resolution without counting the officer, if it is really his act and the product of his influence. In Cook on Stock and Stockholders, *supra*, it is said: "And where the chief stockholder, who is the president, induces his 'dummies' to vote a large salary to him, the corporation may defeat the action at law to recover it." The fact in this case is that the resolution was the act of Adams, both so far as his vote was concerned and the votes of

his servants. The board of directors consisted of Adams, who owned seven hundred and forty-eight shares; Burke, who owned two hundred and forty-nine shares, and the three employees, with one share each, and all were present except Burke. The three shares of stock were always held in the names of employees or hired servants of the corporation, and up to the time of that meeting nothing had ever been paid for them. Whenever one employee quit the service, another one succeeded him and held the share and served as director. Murray, the cattle salesman, was director until he was replaced by Montgomery, the hog salesman, and he served until he was succeeded by Adams' son-in-law. Smith served until he was succeeded by Tubbs, the sheep salesman. These parties had no interest in the corporation or its business, and it made no difference whatever to them where the earnings of the corporation went. When the shares of stock were issued, an employee was simply called in to write his name on the back of the stock certificate, and it was left with the corporation. There was some talk that the stock was security for the payment for it, or to be carried until it was paid for, or something of that kind, but it is beyond question that the shares were only issued for the purpose of forming the corporation and to make up the board of directors. A board of directors being necessary, these parties were used merely as pegs to fill the required places, and were moved or substituted by Adams, the owner of three-fourths of the stock, to suit his interest and convenience. There is no question but that they were subservient, in every respect, to his wishes, and were expected to, and did, obey his will. There can be no question who dominated the meeting or whose influence it was that brought about the resolution, and it is not remarkable that the vote was unanimous. Adams was the master and director and the others were his servants, and the resolution was voidable at the instance of Burke.

We think the Appellate Court was right in affirming the decree so far as it required Adams to refund a proportionate share of the salary to Burke.

The cross-error assigned by the appellee questions the judgment of the Appellate Court in reversing the decree so far as it allowed a proportionate share of the commission on shipments of sheep by J. B. Long & Co. to Liverpool. Adams was a partner in that firm, which was engaged in buying and feeding sheep in Minnesota and the northwest. Adams furnished the money to buy and feed the sheep, and Long managed the business. The money was raised by Long drawing drafts on the corporation of the George Adams & Burke Company, and an account of such moneys was kept on the books of the corporation at the stock yards. The drafts were accepted and were then met by personal checks of Adams, so that they were paid with Adams' money. The sheep were fed for the English market and shipped to Liverpool, where they were sold by Roddick & Son. The arrangement between Adams and Long was, that Adams was to furnish the money and Long was to do the work. The sheep were not sold or handled in any manner by the corporation in which Burke was a stockholder, but the business was the business of Adams and it was his money that was used. Shipments commenced during the existence of the partnership, and continued from February 1, 1894, to November 1, 1896. It seems that the custom at the stock yards is, that if a commission firm sell sheep they receive a commission, or if they have advanced money on the sheep they receive a commission whether they sell them or not, but if they have no advancements and do not sell the sheep they are entitled to no commission. The ground of Burke's claim is, not that they sold or handled the sheep or that they passed through their hands in any way, but that the advancements made by Adams were made by drawing drafts on the corporation,

and therefore the corporation advanced the money on the sheep. If the drafts had been drawn directly upon Adams there would be no pretense of a claim, and while they were drawn upon the corporation they were always, in fact, paid by the personal check of Adams, so that the corporation never, in fact, made any advancements. Adams was the only one having any real interest in the firm of J. B. Long & Co., and we think the evidence did not justify the circuit court in awarding to Burke a share of the commission on sales made at Liverpool by Roddick & Son.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*