---

(*Superior Court of Cook County, In Chancery.*)
### Bardeen Paper Company, et al.
#### vs.
### The Western Coated Paper & Card Company, et al.
(1903.)

1. CORPORATIONS—WHETHER STOCK FULL PAID. Where half of the capital stock of a corporation is issued in payment for the right to use a patented process for the manufacture of which

the corporation was formed, it was held that in the absence of fraud the stock must be considered as full paid even though the patented process was of an uncertain value.

2. SAME. The fact that part of the shares of stock of a corporation taken in exchange for the right to use a patented process, were distributed among promoters as a bonus, does not show that there was a fraudulent overvaluation of the patented process.

3. DIRECTORS—FRAUD OF—PERSONAL PROFIT IN RELATION TO CORPORATE TRANSACTIONS. Where a director of a corporation receives a number of the shares of the capital stock of the corporation from the person to whom the same were issued in exchange for certain patent rights, it was held that such shares were the property of the corporation and the director must account for their value.

4. DIRECTOR—DEALING WITH CORPORATE PROPERTY FOR HIS OWN BENEFIT. While a director of a corporation is not a technical trustee, his relation to the corporation is a fiduciary one, and he cannot deal with the corporate property for his own benefit, or use it for his individual purpose.

5. SALARIES OF CORPORATE OFFICERS—WHEN ILLEGAL. Where a salary is voted to a corporate officer by his procurement, or where his vote is necessary to pass the resolution the action is void and such officer can be compelled to refund. (See note 3.)

*Dupee, Judah, Willard & Wolf*, solicitors for complainants. *James D. Andrews*, of counsel.

*Rubens, Dupuy & Fischer*, solicitors for defendants.

### STATEMENT.

HOLDOM, J.:—

The complainants, judgment creditors of the defendant corporation, whose judgments remain unpaid, and upon each of which executions have been duly returned by the sheriff unsatisfied, have brought this bill under section 49 of the chancery act and paragraph 8 of the corporation act, being a creditor's bill, upon the theory that the defendants Schmidt, Marquis and Pagenstecher are indebted to the defendant corporation for unpaid stock subscriptions and for money due to the corporation for salaries received by them as president, vice president and treasurer, respectively, under a void resolution passed by the board of directors of the company Jan-

uary 9, 1893. Pagenstecher has since deceased and the bill abates as to him.

Prior to February 9, 1891, Joseph Kayser had invented a process for coating paper on both sides, and had procured letters patent upon the same from the United States, number 445955. On that date his wife, Johanna Kayser, she being the owner, entered into a contract with Joseph Sachs and John W. Krueger to the effect that if they would, on or before the 9th of September, 1891, procure a corporation to be formed with a capital stock of $100,000, and procure $50,000 in cash to be paid to such company as part of its capital, and also procure $50,000 of the shares of such company to be issued to her as full paid up stock, she would sell and assign said letters patent and would transfer 100 shares of such stock to John W. Krueger and 150 shares to Joseph Sachs and 100 shares to promoters of such company to be designated by Krueger and Sachs; that on the same day said Sachs and Krueger and Joseph Kayser, the inventor, made an agreement in writing wherein it was recited that the Western Coated Paper and Card Company, with principal offices at Chicago, was about to be incorporated under the laws of Illinois, with a capital of $100,000, for the purpose of manufacturing and selling lithographic, chromo and other coated paper, and that Sachs and Krueger were to be two of the original incorporators, and they desired to secure the services of Joseph Kayser, and the said Kayser did agree to serve said Sachs and Krueger or their assigns in such business and to act as manager and superintendent of the factory of said contemplated company when the company was incorporated and $100,000 of stock subscribed and fully paid, at a salary of $4,000 per annum, payable in weekly installments, and also procure the services of his son, Alfred C. Kayser, as assistant superintendent at a salary of $2,000 per annum, covenanting that said Kayser and his son were fully acquainted with the process of manufacturing coated paper, the employment to continue for five years, with a covenant that Sachs and Kayser might assign said contract to the contemplated company.

Through the efforts of Sachs and Krueger the defendant corporation was formed in April, 1891, with a capital stock of $100,000, divided into 1,000 shares of $100 each. At first the directors consisted of seven persons, viz., Krueger, Sachs, the defendants, Schmidt' and Marquis, and Pagenstecher, James White and H. J. Smith. The following year the number of directors was reduced to five, White and Smith retiring. On the 13th of April, 1891, the defendant Leo Schmidt was elected president, Krueger, secretary, and Pagenstecher, treasurer, of the company. At that meeting by-laws were adopted, article VIII reading: "Salaries of all officers and employees of the company shall be fixed by the board of directors." On May 19, 1892, the defendant Schmidt was re-elected president, and A. N. Marquis elected vice-president, Pagenstecher, treasurer, and John W. Krueger, secretary.

At the directors' meeting of July 8, 1891, the following communication was read to the board:  -

"*To the Western Coated Paper & Card Company.*

GENTLEMEN: I am the owner of the letters patent of the United States of America for a new and useful improvement in the apparatus for coated paper, which letters patent are number 445955, dated February 23, 1891, which I agree to assign and transfer to you in consideration of your issuing to me $50,000 worth of the capital stock of your company, said shares of stock being one-half of the entire capital, full-paid and non-assessable. In addition thereto I agree, with my husband, Joseph Kayser, and my son, A. C. Kayser, to deposit for your sole use with any reliable trust company, certain receipts or formulas used in coated paper.  .

Yours truly,

JOHANNA KAYSER.

The corporation record shows the following action taken upon said proposition: "Resolved, that we accept the proposition of Mrs. Johanna Kayser, in which she is joined by Joseph Kayser and A. C. Kayser, and the president and secretary of our company are hereby authorized and directed to issue to the said Johanna Kayser on her order said $50,000 worth of stock of this Western Coated Paper & Card Com-

pany. Thereupon these receipts or formulas for using coated
paper were sealed in presence of directors by Joseph and A.
C. Kayser and placed with the Illinois Trust & Savings Bank
with the following remarks on the sealed envelope: 'The
within documents are deposited with the Illinois Trust Com-
pany by Joseph Kayser and A. C. Kayser and Western Coated
Paper & Card Company.' "

Mrs. Kayser had theretofore subscribed for 500 shares of
stock.

At this time Leo Schmidt was a director and president of
the company, and had subscribed for $10,000 of this stock
and had also paid for $10,000 of stock issued to Pagenstecher,
who was his brother-in-law. An assignment of the contract
of service with Joseph Kayser was made to the company by
Krueger and Sachs and accepted by the company in writing,
Leo Schmidt executing the acceptance as president in behalf
of the company, and stock certificate No. 1 of the company
for 500 shares was thereupon issued to Mrs. Johanna Kayser,
dated July 1, 1891. That certificate was afterward surren-
dered and canceled and in its place fifty shares were issued
to A. C. Kayser, 135 shares to Joseph Sachs, eighty shares to
John W. Krueger, fifty-four shares to Leo Schmidt, thirty-
five shares to John E. Wright, thirty-five shares to John
White, thirteen shares to Fred C. Laird and thirteen shares
to W. H. Lee. The fifty-four shares issued to Leo Schmidt
were in the nature of a bonus for his having interested
himself in subscribing to the stock of the company for him-
self and Pagenstecher 200 shares, and this understanding was
had prior to the making of such subscription and prior to his
election as a director and president of the company, and this
subscription for two hundred shares of stock made the stock
fully subscribed for.

One H. J. Smith failed to make good his subscription of
$5,000, and Leo Schmidt took $2,000 of this stock and a Mr.
Hutchinson the remaining $3,000. Schmidt paid altogether
$22,000 to the company for his own, Pagenstecher's and $2,000
of the Smith stock subscription. Of the shares of stock is-
sued to Johanna Kayser, Leo Schmidt acquired from White,

Wright, Laird, Lee and Krueger 126 shares, for which he paid from $80 to $100 per share.

The president and vice-president to January 9, 1893, had served without salary. On that day at the meeting of the board of directors the following resolution was passed: "Resolved, that the president of the Western Coated Paper & Card Company receive a salary of $5,000 per annum, and the vice-president a salary of $500 per annum, and the treasurer an additional $1,000." There were present at this meeting Schmidt, Marquis, Pagenstecher, Krueger and Kayser. The evidence shows that Krueger and Kayser refused to vote on this resolution. Krueger, the secretary, testified that as such he wrote up the record of the meeting and that the resolution as originally recorded by him was: "To compensate them for their capital invested, being ten per cent of their investment," and the record book shows an obliteration where this recitation appears; that originally, at the request of President Schmidt, he, Krueger, drew a pencil line though those words and that said resolution so appeared at the time he left the company, June 1, 1896. The resolution was carried by the votes of Marquis and Pagenstecher, Schmidt being in the chair as president, Krueger and Kayser refraining from voting.

## OPINION.

The theory of complainant's bill as to over-valuation of the Kayser patent and secret process, in order to be maintained, must be infected with the "virus of fraud," and the question for determination is whether such allegation of fraud is sustained by the evidence.

At the time Krueger and Sachs undertook to exploit this patented and secret process for coating paper on both sides with a single passage through a coating machine, no mill manufacturing this kind of paper had been established west of New York and the New England states, and no one but Joseph Kayser and his son Alfred were available to superintend its manufacture and operate a mill of that character,

and the west was a promising field for the establishment and operation of such a mill.

Neither the patent, secret process, nor the services of the Kaysers combined, had any market or ascertainable value, and unless the process could be made available by the manufacture of coated paper in accordance with the patent and formula, they were certainly valueless. This condition must not be lost sight of; and to make this process of any value it needed to be developed by being put into practical operation; in other words, it was necessary to have constructed a mill with all necessary machinery and appliances to manufacture this coated paper. A common and ordinary way of bringing this about is through the organization of a corporation. To do so needs the time and services of some one or more persons capable of so doing and of interesting capital in the project. Without this latter the patent, formulas and ability of the Kaysers would be of no value. It was therefore necessary for the Kaysers to interest such men as Krueger and Sachs in the affair. Such being the condition the contracts of February 9, 1891, resulted. Sachs and Krueger as promoters were necessary to make available the ingenuity of Joseph Kayser, and to put into operation the invention and discovery in relation to "coated paper" which he possessed. Enterprises of this character in the industrial world are brought forth by the method which the Kaysers adopted, and through which the Western Coated Paper & Card Company was brought forth as a Chicago industry.

Did Schmidt and Sachs, Krueger and the Kaysers, honestly and in the exercise of reasonable judgment and in a modestly sanguine hope for the future, believe that the patent, formula and secret process and the services of the Kaysers for five years under that contract were worth $50,000? Did they honestly, from the information which they possessed, in the exercise of a reasonable discretion, from the way matters and things appeared to them at that time, believe the project was feasible, and that the processes and the ability of the Kaysers to manufacture coated paper thereunder were reasonably worth $50,000, and resting in that belief was this undertak-

ing finally consummated in the manner shown by the proof?
Or, did these parties with an intent to overreach and obtain
credit where credit ought not to have been given, fraudu-
lently put a valuation upon these properties at the sum of
$50,000? Neither the actions of any of the parties directly
or remotely interested, or the outcome of the venture prior
to 1896, warrant any such conclusion. Because Johanna
Kayser finally received but $10,000 or $15,000 of this stock
is no evidence of over-valuation, and what she did with the
balance of her stock in distributing it among the promoters
who had been instrumental in bringing about the sale neither
proves nor tends to prove the allegation of fraudulent over-
valuation.

*Taylor v. Walker,* 117 Fed. Rep. 737, and cases there cited,
are conclusive of this question, and are extreme cases on this
point, and they find their support in the absence of proof of
fraud. That there was an over-valuation gross and extreme
in the *Walker Case* is admitted, and the manner of its occur-
rence is chargeable to Walker. The disastrous result which
flowed from the gross over-valuation was none the less be-
cause the element of fraud did not enter into the over-valua-
tion, but the parties were exculpated from the liability which
would have ensued if the over valuation had been tainted
with fraud. *Coit v. Gold Amal. Co.,* 119 U. S. 343.

And so in the case at bar, there is no evidence which points
to fraud as a proven fact. At the most it is presumed by
complainants from the fact that the promoters received for
their services a part of Mrs. Kayser's stock. The undisputed
fact that Leo Schmidt acquired 126 shares of the Kayser
stock issued to others and that he paid therefor from 80 to
100 per cent of its face value, inhibits any assumption that
Schmidt did not honestly believe that the corporation had re-
ceived a *quid pro quo* for the $50,000 of stock issued to Mrs.
Kayser. The strongest evidence of a person's belief in value
is not what he is willing to advise another to pay, but that
which he will himself pay, and Schmidt comes up in the full-
est measure to this test.

Fraud is never presumed, but must be proved. *Dexter v.*

*McAfee,* 163 Ill. 508; *Spring Valley Coal Co. v. The People,* 157 Ill. 543; *Swift v. Yanaway,* 153 Ill. 197, 203. I am unable to find from the proven facts that there was a fraudulent overvaluation of the property for which the $50,000 stock was issued to Mrs. Kayser, and I do find, as a matter of fact, that the Kayser stock was in fact paid for in money's worth, and that there is not any financial liability resting on the Kayser stock. *Coffin v. Ransdell,* 110 Ind. 417; *Drummond's Case (In re China and Labuan Coal Company),* L. R. 4, Ch. Ap. 772.

In *Drummond's Case, supra,* the court said: "If a man contracts to take shares he must pay for them, to use a homely phrase, 'in meal or in malt,' he must either pay in money or in money's worth. If he pays in one or the other that will be a satisfaction."

But to my mind another principle of law is applicable to this case and the relation of Leo Schmidt to it. It is true that at the time Schmidt and Pagenstecher subscribed for 200 shares of stock and Schmidt took by assignment twenty shares of the fifty shares subscribed for by H. J. Smith, Schmidt had made an agreement with Krueger and Sachs by which he was to receive fifty-four shares of the stock issued to Mrs. Kayser under her agreement with them, but such agreement at that time was but tentative; it needed for its consummation the action of the directors of the corporation of the Western Coated Paper & Card Company. No directors had to that time been elected, and had Schmidt not been elected a director, but had he simply been a stockholder, he would have been free to have accepted of the fifty-four shares without being accountable to the company therefor, as he then owed it no duty; but afterward, and on April 13, 1891, he was by the stockholders elected a director of the company, and on the same day at a director's meeting, elected president, and on July 8, 1891, at a meeting of the board of directors at which Schmidt, being president, presided, the proposition of Mrs. Kayser, her husband, Joseph Kayser, and son Alfred, was submitted and accepted, and in pursuance of that action at that meeting the 500 shares of stock were

issued to Mrs. Kayser. It is too elementary a principle to need citation of authority that no trustee can profit from his trust. It was Schmidt's duty as such director and president to make as good a bargain as possible with the Kaysers, and this fifty-four shares of stock so received by Schmidt must inure to the benefit of the corporation and be treated as unpaid stock, and as having been received for the benefit of the corporation, and he held to be indebted to the corporation for its face value at the time when he received it, and he must be held to be a debtor to the corporation in the sum of $5,400 on July 8, 1891, and liable for interest thereon until the time of payment at the rate of five per cent per annum. *Hoffman v. Reichert*, 31 Ill. App. 558; *Same v. Same*, 147 Ill. 274.

The appellate court in deciding this case said (p. 562): "Hoffman, at the time he claims he took possession of the leasehold interest, was both a director of the company and its treasurer. As such he could not deal with the property of the company except as such officer * * * such possession was in law the possession of the corporation. While a director of a corporation is not a technical trustee, still his relation to the corporate property is, in its very nature, a fiduciary relation, and as such director he *can not deal with the corporate property for his own benefit, or use it for his individual purpose.* * * * The possession of a trustee is presumed to be the possession of the *cestui que trust.*"

The supreme court in deciding this case on a further appeal from the appellate court said (p. 279): "If Hoffman, before taking possession of the property, had resigned as director and treasurer, and notified the company that he would no longer act for it, a different question would be presented. But such was not the case. In speaking in regard to the duties of directors of a corporation, Morawetz on Private Corporations (vol. 1, sec. 511), says: "The directors or trustees of a corporation, in accepting their appointment to office, impliedly undertake to give the company the benefit of their best care and judgment, and to use the powers conferred upon them solely in the interest of the corporation. They

have no right, under any circumstances, to use their official positions for their own benefit or the benefit of any one except the corporation itself. It is for this reason that the directors have no authority to represent the corporation in any transaction in which they are personally interested, in obtaining an advantage at the expense of the company. The corporation would not have the benefit of their disinterested judgment under these circumstances, as self-interest would prompt them to prefer their own advantage to that of the company.' "

By parity of reasoning the fifty-four shares of stock which Schmidt obtained of the Kayser stock was the property of the corporation of which he was a director and president, and he having converted it to his own use is liable for its value at the time of such conversion; in other words, it being the property of the company at that time, it was his duty to pay for it if he desired to retain it, and not having done so, he must do now what he should have done then. *Hoyle v. Plattsburgh & Montreal Railroad Co.*, 54 N. Y. 314.

In *Gilman, Clinton & Springfield Railroad Co. v. Kelly*, 77 Ill. 426, it is held illegal for directors of a railway company to become members of a construction company with whom they have made a contract to build and equip the road, so as to share in the profits, and if they do, they will in equity be compelled to account for the profits realized. In this case the directors were held as trustees for the stockholders and it was held a breach of duty to transfer the trust or to assume obligations inconsistent with that relation, or to place themselves in opposition to the interests of the stockholders. On page 435 the court said: "The law has absolutely inhibited the agent or trustee from placing himself in a position where his own private interests would naturally tend to make him neglectful of his obligations to his principal, or where his position would afford him an opportunity to speculate in the trust property. Accordingly, it is not indispensable there should be actual injury before the act of the trustee would be declared void, as being interdicted by the policy of the law."

The by-laws of the corporation authorized the payment of salaries to the officers of the corporation and provided that such salaries should be fixed by the directors. No provision was made for the payment of any salary to the president or vice-president until the meeting of directors on January 9, 1893. At this time the directors consisted of five persons, who were all present at the meeting. The corporation record does not recite who voted for or against the resolution. The record being silent on this question, evidence *aliunde* was introduced to prove this fact, and the evidence establishes the fact that Krueger and Kayser did not vote, and the resolution was therefore carried by the votes of Marquis and Pagenstecher on the theory that Schmidt did not vote, and that three were a quorum, and that the votes of Marquis and Pagenstecher were a majority of that quorum; but however that may be, it is immaterial to the solution of this salary question. The motive for voting a salary to the president and vice-president was originally stated upon the records to be: *"To compensate them for their capital invested, being ten per cent on their investment."* This part of the record was obliterated and stricken from the record by the secretary after the reading of the minutes at the request of President Schmidt at the next meeting of the board of directors. If this be true, then the purpose of this resolution was not to pay for the services of the president and vice-president, but to give them an income upon their investments in the company, which theretofore had not paid any dividends. The treasurer's salary was increased by the same resolution as that in which the salary was voted to the president and vice-president; therefore, the votes of Marquis, the vice-president, and Pagenstecher, the treasurer, were necessary—Krueger and Kayser not voting—to carry the resolution, and the evidence clearly demonstrates that the salary resolution was passed at the instance and by the influence of Schmidt, the president. This action by the directors was illegal under the comparatively recent cases of *McNulta v. Corn Belt Bank,* 164 Ill. 427, and *Adams v. Burke,* 201 Ill. 395. The *McNulta Case* is squarely in point, and *Adams v. Burke* is equally so,

and the legal principle deducible therefrom is that a salary voted an officer of a corporation, by his procurement, or where his vote is necessary to pass the resolution, is illegal and void; and the infirmity in this resolution making it void is the fact that all of the parties voting for the resolution were interested in the salaries voted by it, and all the cases are uniformly to the same effect.

It therefore follows that the sums received by Schmidt and Marquis under this salary resolution were without warrant of law and illegal, and must be refunded. It is a demand due to the corporation which may be recovered by a receiver to be appointed in a proceeding of this character.

The pleadings may be amended to conform to the proof and to the findings, or if complainants shall elect not to amend, a decree may be drawn in conformity with this opinion, holding the defendants Schmidt and Marquis liable to account for the amount of money received by them, respectively, under the salary resolution of January 9, 1893, otherwise a decree may be drafted covering the stock and salary issues here decided.

### NOTE.

1. An appeal was prayed and allowed in the above case, to the appellate court but such appeal was never prosecuted.

2. As to whether stock issued in exchange for patent rights, and as to whether stock issued as a "bonus," is full paid, see *Buda Foundry & Mfg. Co. v. Columbian Celebration Co.*, 1 Ill. C. C. 398, aff: 230 Ill. 373.

3. *Directors or officers cannot vote salaries to themselves where their vote is necessary to pass the resolution.* Where directors vote salaries to themselves as officers, such action is voidable where the vote of any of the interested parties or the votes of parties under their control is necessary to pass the resolution. *McNulta v. Corn, etc. Bank*, 164 Ill. 427, 448; *Adams v. Burke*, 102 Ill. App. 148, affirmed 201 Ill. 395; *Mallory v. Mallory*, 61 Conn. 131, 23 Atl. 703; 10 Cyc. 899, and cases cited. Cook on Corporations, § 657, p. 1507. And where concert of action is shown it is immaterial that the salary of each was fixed by a vote which of and by itself would have been proper if the vote of *any* of the parties interested in the scheme was necessary on each particular ballot. *Mallory v. Mallory*, 61 Conn. 131. But see, *McNab v. McNab*, 16 N. Y. S. 448 (criticized 10 Cyc. 899) and explained in *Kearns v. West Point*, 42 N. Y. S. 773.

Where a salary has been illegally declared, a court of equity will convert it into a fund at the suit of an injured stockholder, giving him his share as dividends where circumstances warrant. *Brown v. De Young,* 167 Ill. 549; *Adams v. Burke,* 102 Ill. App. 148, aff. 201 Ill. 395. "Where directors vote large pay to themselves, evidently in bad faith and with a view to depriving the corporation of more than a *reasonable proportion of its net earnings* a dissenting stockholder may file a bill in equity to have the amount recovered back." Cook on Corporations, § 657. Cited with approval in *Bixler v. Summerfield,* 195 Ill. 147.

Combination of stockholders to divert property of corporation to pay themselves large salaries can be attacked in equity. *Sellers v. Phoenix Co.,* 13 Fed. 20; *Bixler v. Summerfield, supra.* Equity has jurisdiction to determine whether or not the salary paid an officer is reasonable or not and to compel the repayment of the surplus. *Davis v. Davis,* 52 Atl. 717 (N. J. Eq.); *Lillard v. Oil Co.,* 56 Atl. 254 (N. J. Eq.); *Mitchell v. United Boxboard Co.,* 66 Atl. 938 (N. J. Eq.). Especially where voted by one holding majority of stock. *Lillard v. Oil Co., supra.* A salary which takes all the profits and part of the capital stock is unreasonable. Cook on Corporations, § 657, p. 1507.—Ed.